UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS FOR

THE EASTERN DIVISION


KIMBERLY SUE LOPEZ,                              )

*As Next Friend of Minor Child, B.P.L.A.,*       )          No. 1:24-cv-13340

 *Plaintiff(s),*                                 )

                                                 )          Hon. Matthew F. Kennelly

v.                                               )

                                                 )

KUBALANZA, ET AL.,                               )

*Defendant(s).*                                  )


PLAINTIFF'S RESPONSE IN OPPOSITION TO STATE DEFENDANTS, CARLI
LABRACO, JACLYN ANTONIOLLI, KELLY A. MOORE, RAED SHALABI, NASEEM
LATIF,FATIMA ABUZERR,  RUSSELL KNIGHT, FELICIA MUHAMMED, THE COUNTY
<u>DEFENDANTS, AND STEVEN MARSHALL'S, MOTIONS TO DISMISS</u>

# TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………...............1

FACTUAL BACKGROUND …...................................................................................................3

ARGUMENT …...........................................................................................................................7

I. THE COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFF'S CLAIMS...7

A. Plaintiff's Claims Are Not Barred by the Rooker-Feldman Doctrine ……………….......7

B. Younger Abstention Does Not Apply to This Case ……………………………….............9

C. The Domestic Relations Exception Does Not Preclude Federal Review …........................11

D. The Eleventh Amendment Does Not Immunize Defendants from Suit ………….............. 13

II. DEFENDANTS ARE NOT IMMUNE FROM SUIT AND CAN BE HELD LIABLE UNDER §1983........................................................................................................................................15

A. The Defendant Judges Acted Outside of Their Judicial Capacity and Jurisdiction …......... 15

B. Quasi-Judicial Immunity Does Not Protect the Clerk Defendants …………........……......18

C. The Court Reporters Can Be Held Liable for Denying Access to Transcripts ……........... 19

D. Private Parties Who Acted in Concert with State Actors Are Liable Under §1983.............20

III. PLAINTIFF'S CLAIMS AGAINST DEFENDANT KUBALANZA ARE TIMELY ….......22

IV. PLAINTIFF SUFFICIENTLY ALLEGES VIOLATIONS OF HER CONSTITUTIONAL RIGHTS…..........................................................................................................................24

A. Procedural Due Process ……………………………………………………………….....24

B. Substantive Due Process ……………………………………………………………….....26

C. Equal Protection ……………………………………………………………………...…28

D. First Amendment (Right of Access to Courts) ……………………………………… .......30

E. Sixth Amendment (Right to Counsel) ……………………………………………….......31

F. Eighth Amendment (Excessive Fines and Cruel Punishment) …………………….............. 32

**V. PLAINTIFF STATES A VALID CLAIM UNDER THE AMERICANS WITH DISABILITIES ACT** … ..................................................................................34

**VI. PLAINTIFF'S STATE-LAW CLAIMS AND OTHER CLAIMS ARE VIABLE**................36

    A. Fraud Upon the Court and Procedural Irregularities Warrant Relief ..........…….…..…… 37

    B. Illinois Law References (Bail Provision and SAFE-T Act) Support Plaintiff's Claims.......39

CONCLUSION ............................................................................................................40

<u>TABLE OF AUTHORITIES</u>

*Cases*

Ankenbrandt v. Richards, 504 U.S. 689 (1992) ……………………………….......... 11, 12

Antoine v. Byers & Anderson, Inc., 508 U.S. 429 (1993) ………………………........… 18, 19

Ashcroft v. Iqbal, 556 U.S. 662 (2009) ……………………………………….…......21, 24, 37

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ……………………………….…… 21, 24, 37

Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288 (2001) ……........ 21, 22

Cook v. Winfrey, 141 F.3d 322 (7th Cir. 1998) ……………………………….............…… 7, 8

Cooney v. Rossiter, 583 F.3d 967 (7th Cir. 2009) …………………………….......... 21, 37

Courthouse News Serv. v. Brown, 908 F.3d 1063 (7th Cir. 2018) …………….............…….…. 18

Dennis v. Sparks, 449 U.S. 24 (1980) ……………………………………….......… 20, 21

Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1 (2004) …………………......…...…..……12,13

Elustra v. Mineo, 595 F.3d 699 (7th Cir. 2010) …………………………………...........… 13, 20

Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280 (2005) …………….................… 7

Lance v. Dennis, 546 U.S. 459 (2006) …………………………………………................... 7

Maine v. Thiboutot, 448 U.S. 1 (1980) ………………………………………….............… 12

Moore v. Sims, 442 U.S. 415 (1979) ……………………………………………............… 10

Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306 (1950) ……………….................. 25

New York v. United States, 505 U.S. 144 (1992) …………………………….................… 13

Pierson v. Ray, 386 U.S. 547 (1967) …………………………………….................…… 15

Rooker v. Fid. Tr. Co., 263 U.S. 413 (1923) ……………………………................…… 7

Santosky v. Kramer, 455 U.S. 745 (1982) …………………………….................……… 27

Sprint Commc'ns, Inc. v. Jacobs, 571 U.S. 69 (2013) ……………………..............… 9, 10

Stump v. Sparkman, 435 U.S. 349 (1978) …………………………….................……… 16

Troxel v. Granville, 530 U.S. 57 (2000) ……………………………….......…..…… 26, 27

Tennessee v. Lane, 541 U.S. 509 (2004) ……………………………….......….……… 35

Village of Willowbrook v. Olech, 528 U.S. 562 (2000) ……………….........………….… 28

Watkins v. Watkins, 2023 IL App (4th) 230311-U …………………........…..………… 27

Younger v. Harris, 401 U.S. 37 (1971) …………………………………..........…… 9, 10

Statutes and Constitutional Provisions

42 U.S.C. § 1983 ……………………………………………………….......… 11, 20, 21

42 U.S.C. § 12132 (ADA, Title II) ………………………………………......……… 34, 35

28 U.S.C. § 1331 ……………………………………………………….......…....……… 7

28 U.S.C. § 1343 …………………………………………………………....….....……… 7

U.S. Const. amend. I ……………………………………………………......………… 30

U.S. Const. amend. VI …………………………………………………….......………… 31

U.S. Const. amend. VIII ……………………………………………….......…………… 32

U.S. Const. amend. XIV …………………………………………………....…… 24, 26

Ill. Const. 1970, art. I, § 9 (Bail) …………………………………….......………… 38

750 ILCS 5/604.10 ……………………………………………….......……… 4, 25

Other Authorities

Fed. R. Civ. P. 17(c) …………………………………………………………............… 13

Fed. R. Civ. P. 55(a) ……………………………………………………............… 5

Illinois SAFE-T Act, Pub. Act 101-652 …………………………………............… 38

## INTRODUCTION

Plaintiff, Kimberly Sue Lopez, in propria persona, sui juris, respectfully submits this memorandum in opposition to Defendants' motions to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Defendants' 78-page opening memorandum advances numerous arguments – including the Rooker-Feldman doctrine, Younger abstention, the domestic relations exception, various immunity defenses, and alleged pleading deficiencies – in an effort to avoid answering for the serious constitutional violations at issue. Each of these arguments fails under the law and the facts. Plaintiff is not seeking a custody determination from this Court but rather seeks relief for constitutional injuries inflicted under color of state law. The state courts were used as an instrument to deprive Plaintiff of fundamental rights without due process, and federal intervention is both appropriate and necessary to ensure justice is done.

Defendants mischaracterize this case as a simple domestic dispute beyond federal purview. To the contrary, Plaintiff's claims center on systemic due process failures, Americans with Disabilities Act ("ADA") violations, and fraud upon the court that permeated the state proceedings. Over a period of four years, Plaintiff's minor child was unlawfully removed from her care and custody based on a void order obtained through misrepresentations and procedural irregularities. Plaintiff was denied notice and a meaningful opportunity to be heard and even held in indirect criminal contempt without proper safeguards. Court officials refused to file Plaintiff's

pleadings and denied her access to court records and accommodations, effectively obstructing her attempts to seek redress. This extreme misconduct is not a mere family law matter; it is a civil rights matter involving egregious violations of constitutional due process and equal protection, as well as infringement of rights secured by the ADA and other federal laws.

As demonstrated below, none of the abstention doctrines or jurisdictional bars invoked by Defendants apply. The Rooker-Feldman doctrine is inappropriate because Plaintiff does not ask this Court to review a valid, final state decree, but rather to address independent federal claims arising from fraudulent and void actions that deprived her of rights. In fact, the opposite is true, Plaintiff has a valid, final state decree that has been ignored for four years. The Younger abstention is unwarranted given the bad-faith and extraordinary circumstances of the state proceedings, which have effectively left Plaintiff without an adequate forum for her federal claims. The domestic relations exception to federal jurisdiction does not bar this lawsuit because Plaintiff seeks no divorce, alimony, or custody decree, as she has a valid custody decree– she only seeks damages and relief for constitutional wrongs . Furthermore, Defendants' immunity arguments cannot shield blatant *ultra vires* and non-judicial acts. Judges who acted in clear absence of jurisdiction, clerks who impeded access to justice, and private parties who conspired under color of law are not immune from §1983 liability. Plaintiff's Complaint, read in the light most favorable to her, adequately pleads each of her claims with detailed factual support, satisfying Rule 8, notice requirements and the Twombly/Iqbal plausibility standard. Finally, Plaintiff has properly invoked the ADA and relevant state-law principles, which reinforce the constitutional deprivations alleged.

In sum, this Court has jurisdiction and should adjudicate Plaintiff's claims on the merits. The misconduct described – from the improper "604.10" custody evaluation to the denial of ADA accommodations and the subversion of normal court process – represents a stunning abuse of power that federal courts are both empowered and obligated to address. For the reasons set forth below, Plaintiff respectfully requests that Defendants' motions to dismiss be denied in their entirety. Plaintiff stands ready to proceed to discovery and ultimately prove that her and her child's rights were violated in a manner that the Constitution and laws of the United States do not tolerate.

## FACTUAL BACKGROUND

Plaintiff's relationship to B.P.L.A. and prior December 24, 2020 -  Plaintiff is the natural mother of minor child B.P.L.A., born on May 4, 2011. Plaintiff had been the child's primary caregiver and, by operation of law, held sole legal custody of B.P.L.A. from birth. Peter John Allsot is the only legally recognized father since the child's birth, as he was married to the Plaintiff at the time of B.P.L.A.'s birth – indeed, the child's birth certificate lists Peter John Allsot, as the father, and Defendant Naseem Latif (the putative biological father) is not listed . *Exhibit 1* is a true and correct, certified copy of B.P.L.A.'s birth certificate, confirming that Mr. Latif is not the recorded father of the child because Mr. Latif refused to correct B.P.L.A.'s birth certificate. Plaintiff's custodial rights over B.P.L.A. were exclusive and should have remained undisturbed absent due process of law.

Unlawful Removal of the Child via a Fraudulent State judicial Order (December 2020) - On December 24, 2020, Defendant Kelly A. Moore – despite lacking legal standing,  utilized the Illinois state court system to have B.P.L.A. removed from Plaintiff's home under false pretenses. Kelly A. Moore , filed *ultra vires,* an "EMERGENCY MOTION TO SUSPEND PARENTING TIME." Ms. Moore filed said motion under ILCS 60/201 and 750 ILCS 5/101 and sought an emergency order in the Cook County Circuit Court, Domestic Relations Division, alleging "concern(s)" for the child. Exploiting the Illinois Domestic Violence Act, GAL Kelly A. Moore, Raed Shalabi, Naseem Latif, and Steven Shalabi, obtained an ex parte emergency order granting Naseem physical possession of the child. This was an improper use of the Domestic Violence Act to litigate a custody issue.. Illinois courts have continued to recognize that "misusing the Domestic Violence Act to litigate custody issues is unconstitutional" .In this case, the emergency order was void *ab initio* because the state court lacked jurisdiction to award possession of B.P.L.A. to Mr. Latif. Plaintiff received no prior notice of Kelly A. Moore's "emergency" petition, nor did it follow the procedural safeguards that Illinois statutes and rules have in place. Please see Exhibits

Proceedings Before Judge Jackson (2020–2021) – Void "604.10" Evaluation and Denial of Hearing. The case was assigned to Judge Kubalanza (now retired), who presided over the case  about March 2021. Judge Jackson was then assigned the case. Instead of promptly returning the child to Plaintiff or conducting a fitness hearing with proper process, Judge Jackson ordered a "Section 604.10" evaluation, and ordered the Plaintiff to pay 100% of the fees.This order was adjudicated without Plaintiff's  then counsel, Mr. Knight, or the Plaintiff present. In fact, Mr. Knight did not receive notice of said order until months after it was adjudicated.  Under Illinois law, 750 ILCS 5/604.10 governs the appointment of professionals to provide evaluations in child custody disputes. Critically, the statute requires the court to specify whether the evaluation is ordered under subsection (a) (court's own motion, interviews) or subsection (b) (agreed psychological evaluation), and in the case of a subsection (b) evaluation, the parties' consent is required. Here, the court issued an ambiguous order for a "604 evaluation" without citing §604.10(a) or (b), and Plaintiff never agreed or signed any authorization for a §604.10(b) evaluation, nor did her then-counsel Russell Knight. See Exhibit.  The evaluator, David Finn, proceeded without proper authority or Plaintiff's consent, making the process unauthorized under Illinois law. Making matters worse, the Plaintiff was then denied a meaningful chance to challenge the evaluator's findings or the necessity of the evaluation. Mr. Finn also failed to notify the Court that he believed Mr. Latif  "paid the judge off", and that during an in-person meeting Mr. Latif and him nearly had a fistfight with each other, which vacated the in-person hearing. Judge Jackson, Mr. Marshall, Mr. Ochoa, Mr. Hagler, and Mr. Filipowicz were all notified about this dangerous, concerning behavior. Judge Jackson refused to rule on a "MOTION FOR MENTAL EVALUATION OF PETITIONER" for Naseem Latif. See Exhibits .

Denial of Visitation and Continued Separation. From December 24, 2020 onward - Plaintiff was wholly denied any access to her child. No interim visitation for Plaintiff was ordered, despite multiple requests. This extreme deprivation occurred despite the fact that Plaintiff has never been found unfit or a danger to her child. To the contrary, at all times Plaintiff has been a loving, capable mother with no criminal history or substantiated abuse allegations. The deprivation of all parental contact for such a prolonged period – without a proper hearing – is unprecedented and unconscionable. It inflicted severe emotional trauma on both Plaintiff and

the child, as well as violating Plaintiff's and her minor child's constitutional right to family integrity.

Conflict of Interest and Bias in State Proceedings - The state court record reveals troubling indications of bias and conflict of interest. Plaintiff's private attorneys Sarah Nolan, Russell Knight, James Hagler, Andrey Filipowicz and Michael Ochoa failed to protect Plaintiff's constitutional rights during these unlawful proceedings. Defendant Jaclyn Antoniolli, Brittany Stevenson, and Kelly A. Moore failed to notify the Plaintiff or the Court of their close friendships. Jacklyn's counsel correctly states that she was licensed in August of 2021, however the reunification occurred from January - July 2021. Plaintiff alleges that these individuals aforementioned acted in concert to mislead the court and prejudice Plaintiff's rights. False or misleading allegations were presented to portray Plaintiff negatively, while Mr. Latif's lack of standing and past misconduct were downplayed or ignored. Communications between Mr. Latif's counsel and court staff were not shared with Plaintiff, and ex parte influences denied the Plaintiff due process of law. These circumstances suggest a collusive effort to deprive Plaintiff of a fair proceeding – effectively a *fraud upon the court*. Plaintiff contends that the evaluator's report and other evidence were tainted by bias and that certain Defendants concealed information (such as the child's true paternity status) from the court. Seen Exibit

Plaintiff's ADA Accommodation Request and Denial - Plaintiff, who suffers from Autism Spectrum Disorder, level I and Attention Deficit/Hyperactivity Disorder, combined type, are neurodevelopmental disorders that make it difficult to communicate at times, and covered under the ADA. Plaintiff requested reasonable accommodations to ensure she could participate fully in the court process. On multiple occasions in 202 and 2024, Plaintiff asked the court and its administrative personnel for accommodations under the ADA, Plaintiff's requests were ignored. These requests were communicated in writing to the court, the ADA coordinator, Defendant Clerk Grant, who at relevant times was acting as a clerk of the Illinois Supreme Court or an officer responsible for handling ADA requests in the court system. Rather than engage in the interactive process or grant any accommodation, Defendant Grant summarily ignored the Plaintiff's ADA accommodation requests, and when the Plaintiff asked in an email if her ADA request was being denied, she was ignored. See *Exhibit* By denying accommodations, the court officials effectively forced Plaintiff to proceed without the accommodations she needed, exacerbating her difficulties in court. Without reasonable accommodations, the Plaintiff's disabilities substantially limits her ability to concentrate, communicate effectively under stress, and represent herself in complex proceedings. The failure to accommodate thus prevented Plaintiff from meaningfully accessing the court services on an equal basis, compounding the due process violations.

Obstruction of Plaintiff's Attempts to Seek Redress (2022–2024) - Faced with continual adverse orders and no relief, Plaintiff took extraordinary steps to seek justice. She attempted to file appeals and emergency petitions in the Illinois Appellate Court and Illinois Supreme Court. However, Defendant Mollakarimi, the Lead Deputy Clerk of the Illinois Appellate Court, and Defendant Grant, the Clerk (or Deputy Clerk) of the Illinois Supreme Court, repeatedly interfered with Plaintiff's filings. For example, when Plaintiff tried to file a pro se notice of appeal and supporting record in mid-2022, the Appellate Court clerk's office delayed docketing her appeal and at one point denied her access to certain trial court records she needed to perfect

the appeal . Plaintiff made multiple requests to obtain transcripts. Court reporters Wiewiora-Kerns and Saviano never produced transcripts. In fact, Ms. Saviano stated in an email that the judge "directs which cases to be on the record." Please see Exhibit Because they actively impeded Plaintiff's access to the courts. As a result, Plaintiff's efforts to obtain state appellate review were thwarted or delayed to her detriment. This pattern of obstruction is further evidence of fraudulent judicial practices and bias. It denied Plaintiff the normal correctives that an appeal should provide, leaving her no choice but to seek relief in federal court.

Contempt Proceedings and Appellate Court Stay (2023–2024) - In 2024, Judge Barrett took the drastic step of holding Plaintiff in indirect criminal contempt. The purported basis was Plaintiff's failure to comply with certain aspects of an improper order, as well as Plaintiff's persistent accusations of fraud against the court – which the judge viewed as contumacious. After a summary proceeding with minimal due process (Plaintiff did not have counsel and was not allowed to present a full defense), the court found her in contempt and ordered punitive sanctions: a fine and a 60-day jail sentence, stayed briefly to allow Plaintiff to purge by complying with conditions that were themselves vague and onerous. Plaintiff had no attorney appointed or present, despite the proceeding's criminal nature and the risk of jailing. The U.S. Supreme Court ruled in *Williams v. Illinois* (1970) and *Tate v. Short* (1971) that incarcerating individuals solely for inability to pay fines or fees was unconstitutional. So, she immediately sought relief from the Illinois Appellate Court. On June 13, 2024, the Illinois Appellate Court (First District) granted an emergency stay of the contempt order, essentially agreeing that serious questions existed about the contempt finding. *Exhibit 3* is a copy of the Appellate Court's June 13, 2024 Order in *Lopez v. Latif*, No. 1-24-1069, staying enforcement of Judge Barrett's contempt sanctions. This appellate intervention vindicated Plaintiff's position that the contempt was wrongful – it was premised on a process that lacked fairness and the findings that were unsupported. The Appellate Court's action underscores the depth of irregularities in the trial court: it is exceedingly rare for an appellate court to stay a contempt order, indicating a strong likelihood of merit in Plaintiff's challenges. However, the Plaintiff was emailed an Order in November allegedly from the Appellate Court regarding the appeal was dismissed for want of prosecution. However, Plaintiff cannot appeal without a certified record, which was denied twice. See Exhibit

Professional License Suspension and Related Federal Case. To compound Plaintiff's hardships, in late 2024 the Illinois Department of Healthcare and Family Services ("IDHFS") and Illinois Department of Financial and Professional Regulation ("IDFPR") took action to suspend Plaintiff's professional full-practice authority nursing licenses, citing non-payment of child support. This action was taken even though there was no valid child support order against Plaintiff . The suspension was executed without notice or a hearing, abruptly halting Plaintiff's career as a licensed Full Practice Advanced Practice Registered Nurse. The license suspension inflicted immediate harm on Plaintiff's livelihood and patients and constitutes an independent due process and Eighth Amendment (excessive fines) violation. In response, on January 15, 2025, Plaintiff filed a separate civil rights lawsuit in this Court (No. 1:25-cv-00457, "Lopez II") against IDHFS, IDFPR, and related officials to address those specific deprivations . Plaintiff did not realize that the two cases were connected, as she believed she was a victim of mistaken identity. Please see Exhibit  Notably, Defendants have attached portions of the Lopez II Complaint to their motion here , apparently to argue that Plaintiff's claims are duplicative or

split. Plaintiff clarifies that the present case (Lopez I) is focused on constitutional violations, including: Fourteenth Amendment (Due Process & Equal Protection Violations) – Plaintiff was denied procedural due process when her minor child was unlawfully removed without proper notice, an opportunity to be heard, or adherence to established legal procedures (Troxel v. Granville, 530 U.S. 57 (2000); Santosky v. Kramer, 455 U.S. 745 (1982); First Amendment (Access to Courts & Retaliation) Plaintiff was prevented from filing court documents and retaliated against for asserting her rights (Gonzalez v. Trevino, No. 22-1025 (June 20, 2024) Sixth Amendment (Right to Counsel) Plaintiff was held in indirect criminal contempt without legal representation, violating Turner v. Rogers, 564 U.S. 431 (2011); Eighth Amendment (Excessive Fines & Punishment)Defendants imposed unlawful financial penalties and sought to incarcerate Plaintiff without due process (Timbs v. Indiana, 139 S. Ct. 682 (2019). Whereas Lopez II addresses the license suspension and supports enforcement violations. The filing of Lopez II underscores that Plaintiff has been forced to fight on multiple fronts to protect her rights – a consequence of Defendants' far-reaching misconduct.

Damages and Ongoing Harm. As a result of Defendants' actions - Plaintiff has suffered devastating harm. She has been deprived of the companionship of her young child during irreplaceable years of childhood – an injury of incalculable emotional magnitude. The child, too, has been harmed by the loss of her mother's care and the instability of being shuffled under dubious legal circumstances. Plaintiff also lost income and her career due to the license suspension and the enormous time and stress of litigation. Her reputation has been damaged by the stigma of the false insinuations made in court (e.g., that she was a "child abuser", in help in criminal contempt, and uncooperative, to name a few). Despite these hardships, Plaintiff has persisted in seeking justice. The factual record she has amassed – including official court documents, correspondence, and transcripts – strongly corroborates her claims. For example, *Exhibit 4* is a collection of email correspondence from 2022 showing Plaintiff's attempts to obtain the trial transcript and file her brief, and the Clerk's office's non-responsiveness. *Exhibit 5* is an excerpt from the void "604.10" evaluation report where the evaluator himself notes the lack of a signed consent by Plaintiff. These and other exhibits paint a picture of a concerted effort by certain individuals to sideline Plaintiff and rubber-stamp an unlawful custody transfer.

In summary, the background of this case is not a typical custody battle that belongs in state court. It is a constitutional tragedy: a loving, fit mother lost her child due to a combination of jurisdictional errors, denial of rights, and malfeasance by those entrusted to uphold justice. Plaintiff now turns to the legal arguments showing why this Court should hear her case and allow her the opportunity to prove these facts and obtain appropriate relief.

ARGUMENT

## I. THIS COURT HAS SUBJECT MATTER JURISDICTION OVER PLAINTIFF'S CLAIMS.

Defendants' jurisdictional challenges – based on the Rooker-Feldman doctrine, Younger abstention, and the domestic relations exception – are misplaced. None of these doctrines strips this Court of jurisdiction over Plaintiff's federal claims. Plaintiff's Complaint raises federal questions (42 U.S.C. § 1983 and ADA claims) and seeks relief for violations of the U.S. Constitution, bringing it squarely within the Court's original jurisdiction . The extraordinary

circumstances alleged also bring this case outside the narrow abstention exceptions. We address each doctrine in turn. Does it violate the Fourteenth Amendment Due Process Clause, the Equal Protection Clause, and federal civil rights laws (42 U.S.C. § 1983) when state-appointed officers—including attorneys, therapists, and guardian ad litems (GALs)—engage in fraud, misrepresentations, and improper state procedures to unlawfully remove a child from the sole legal custody of her parent, thereby depriving them of their fundamental liberty interest in the parent-child relationship?

A. Plaintiff's Claims Are Not Barred by the Rooker-Feldman Doctrine.

The Rooker-Feldman doctrine is a "narrow" jurisdictional rule that prohibits federal district courts from hearing cases that effectively seek review of final state-court judgments . It applies only in "limited circumstances" where a plaintiff who lost in state court complains of injuries caused by a state-court judgment itself and invites the federal court to overturn that judgment. Rooker-Feldman does not apply here for several reasons.

First, Plaintiff does not seek this Court's review or reversal of any final state judgment. There is a final custody decree, and the Plaintiff was granted sole custody of the child. See Exhibit 7.  In effect – indeed, aspects of the state case (such as the contempt order) were stayed on appeal and remain unresolved . Plaintiff is not asking the Court to invalidate a custody decree or modify any state-court order; rather, she seeks damages and declaratory relief for the *independent constitutional violations* committed by Defendants. The Complaint targets the unconstitutional procedures and acts of fraud that occurred during the state case – e.g.,  ex parte removal, the void evaluation, denial of hearings, and obstruction of appeals – not the correctness of a state court's substantive custody determination (which, notably, was adjudicated in the Plaintiff's favor). In other words, Plaintiff's injuries were caused by Defendants' extrinsic conduct (violations of her due process and equal protection rights), not by a state judgment or decree. This distinction is critical and places the case outside Rooker-Feldman's ambit . As the Seventh Circuit has explained, Rooker-Feldman "does not bar actions by nonparties to the earlier state-court judgment" and does not bar a federal claim just because the issue was or could have been addressed in state court . Here, one might argue Plaintiff was a party in state court, but the key point is her federal claims were never actually heard or decided by the state court. Those claims – involving systemic bias, ADA rights, and fraud – are separate from any state-court judgment and thus not the kind of de facto appeal Rooker-Feldman forbids.

Plaintiff alleges that any such judgment was procured through fraud upon the court and fundamental procedural defects. Courts have recognized that Rooker-Feldman does not bar a federal plaintiff from asserting an independent claim that a state judgment was obtained by fraud (also known as an "extrinsic fraud" exception) . Plaintiff's allegations – that Mr. Latif and others misled the state court and that orders were entered without jurisdiction – fit this category. The relief Plaintiff seeks (compensatory and punitive damages for violation of her rights, and declaratory relief) does not require this Court to nullify the state court's orders. For instance, Plaintiff can be compensated for the period her child was kept from her without due process, regardless of whether the state orders are still formally in place or not. Any declaratory judgment from this Court would address the *illegality of Defendants'.* Accordingly, the federal claims are not a direct appeal of a state decision.

In sum, Defendants mischaracterize Plaintiff's lawsuit. This is not a de facto appeal of a custody ruling – it is a civil rights action addressing constitutional violations that the state court failed to remedy. The Rooker-Feldman doctrine does not deprive this Court of jurisdiction under these circumstances . Federal courts have jurisdiction under 28 U.S.C. § 1331 to hear such claims, and 42 U.S.C. § 1983 expressly provides a federal cause of action to redress deprivation of constitutional rights by state actors, even if those deprivations occurred in the context of a state case . Indeed, the Supreme Court in *Maine v. Thiboutot* held that §1983 reaches constitutional violations "even in family law cases" . Dismissing Plaintiff's claims on Rooker-Feldman grounds would improperly immunize the serious misconduct alleged and leave Plaintiff with no forum for relief. The Court should reject Defendants' Rooker-Feldman argument and exercise its jurisdiction in this case.

## B. Younger Abstention Does Not Apply to This Case.

Defendants next invoke Younger abstention, contending that this Court must refrain from hearing Plaintiff's claims because of ongoing state proceedings. The Younger doctrine (from *Younger v. Harris*, 401 U.S. 37 (1971)) is a prudential principle that in certain circumstances federal courts should abstain from interfering with ongoing state proceedings that implicate important state interests. Plaintiff is refusing to ever enter into any Illinois Court again, as she has been terrorized by them.  Younger is a "far-from-absolute" doctrine and applies only in special categories of cases . Even when those categories are met, exceptions exist for bad faith, harassment, or other unusual circumstances. Here, Younger abstention is inappropriate for several independent reasons: (1) Plaintiff's case does not fall into the categories of proceedings to which Younger applies; (2) even if it did, multiple extraordinary circumstances and bad-faith conduct bring this case within established exceptions to Younger; and (3) Plaintiff is not asking this Court to enjoin any pending state proceeding, which is the scenario Younger is concerned with.

First, the ongoing state proceedings the Defendants allege are not the types of proceedings that automatically trigger Younger. In *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013), the Supreme Court clarified that Younger abstention is limited to three "exceptional" categories: (1) ongoing state *criminal* prosecutions; (2) certain civil enforcement proceedings akin to criminal prosecutions; and (3) pending "civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions" . The previous State case was not state-initiated enforcement proceeding – it was initiated by Mr. Latif, a private party, and was an unjustifiable matter. At most, one might argue the contempt proceeding is an interest in the court's authority. But here the contempt had been stayed and was under appellate review. If anything, *Sprint* suggests that if a case doesn't fit the three enumerated categories, Younger doesn't apply, period. Therefore, Younger abstention should not even be triggered by the facts of this case.

Second, even assuming Younger could apply, this case falls under recognized exceptions to Younger due to bad faith, bias, and irreparable harm. Federal courts will not abstain under Younger if the state proceeding was brought in bad faith or with the intent to harass, or if extraordinary circumstances exist – for example, if the state tribunal is biased or the statute involved is flagrantly unconstitutional such that no adequate state forum exists to hear the federal

claims (*Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 435 (1982)). Plaintiff has sufficiently alleged precisely such circumstances. The state proceedings here were used in bad faith and failed to follow their own State's statutes, codes, or rules,  to deprive Plaintiff of her rights: Mr. Latif and others invoked the process not to adjudicate fairly, but to wrongfully wrest possession of Plaintiff's child through deceit and procedural abuse. The bias and prejudice against Plaintiff in the state courts were so pervasive that she effectively has no hope of a fair hearing on her constitutional claims there. Indeed, some of Plaintiff's key constitutional contentions (e.g., that the clerks violated her ADA rights, or that the entire process lacked jurisdiction from the start) could not be meaningfully raised within the state's proceedings – the state judges are unlikely to rule on his own bias or nullify his own orders due to fraud, and the clerks' misconduct was outside the record of those proceedings. The Illinois Appellate Court's intervention (staying the contempt) was a positive sign, but even that court is limited to reviewing the record developed below, which, as described, was distorted by missing filings and transcripts. Thus, Plaintiff has not had, and will not have, an "adequate opportunity" in the state proceedings to raise and obtain redress for her federal claims . This is precisely when a federal court can step in despite Younger. The ongoing denial of Plaintiff's inalienable rights also constitutes irreparable harm that cannot await protracted state processes to conclude. Every day of unjust separation is a harm that monetary relief cannot fully remedy. Abstaining would prolong that harm.

   Third, Plaintiff is not asking this Court to enjoin or interfere with any specific order currently pending in state court. She is not seeking an injunction to halt a state custody case or to direct the state judge's actions. Instead, she primarily seeks retrospective relief (damages) and declaratory relief regarding past violations. In the absence of a request for injunctive relief that would stop or alter the course of an ongoing state case, Younger is generally not implicated. Defendants have not pointed to any requested relief in the Complaint that would directly conflict with the state court's ability to proceed. And notably, at this juncture the state court's proceedings are completed., so there is no risk of "duplicative litigation" or federal-state conflict if this Court allows Plaintiff's case to go forward.

   In support of abstention, Defendants rely on the general notion that domestic relations are an important state interest. Certainly, states have a strong interest in adjudicating child custody matters. But that interest assumes the state adjudicative process comports with due process and fundamental fairness. The state's interest is not in depriving parents of rights without process – Illinois has no legitimate interest in orders obtained by fraud or in violating ADA mandates. To the extent the state's interest is implicated, it is outweighed here by Plaintiff's interest in a federal forum to enforce her federal rights. Moreover, once Plaintiff alleges that the state processes themselves are unconstitutional, federal courts have an interest in ensuring supremacy of federal law. The Supreme Court has cautioned that abstention is not warranted when it would mean "there is no potential state forum in which [federal] constitutional claims can be raised" (see *Moore v. Sims*, 442 U.S. 415, 430 (1979)). That is effectively the scenario here – the state forum was structurally tainted against Plaintiff.

   Finally, it bears noting that Plaintiff waited to file this federal action only because she didn't know better, as she is not an attorney, and in respect for the doctrine of exhaustion of remediesShe did not run to federal court at the first sign of trouble; she attempted to appeal and

correct the issues within the state judiciary. Only when those avenues were blocked or delayed did she seek relief here. This chronology demonstrates that Plaintiff is not trying to undermine the state courts or bypass them; rather, she is seeking relief for violations that the state courts either caused or could not remedy. Therefore, exercising jurisdiction will not show disrespect to the state system; instead, it will reinforce the constitutional floor below which state processes may not sink.

For all these reasons, Younger abstention is unwarranted. This case falls outside Younger's core, and even if it didn't, the bad faith and extraordinary circumstances compel an exception. The Court should retain jurisdiction and address Plaintiff's claims on their merits.

C. The Domestic Relations Exception Does Not Preclude Federal Review.

Defendants suggest that because this case involves an alleged child custody dispute, it belongs exclusively in state court under the so-called domestic relations exception to federal jurisdiction. There is no custody to dispute, in accordance with Illinois state statutes. This argument misapprehends the scope of that judge-made exception. The domestic relations exception is a limited doctrine that precludes federal courts from issuing or modifying certain types of decrees (like divorce, alimony, or child custody orders) in cases based solely on diversity jurisdiction . It does not apply to federal question cases at all, and it does not bar federal courts from adjudicating constitutional claims that happen to arise from a domestic situation. The U.S. Supreme Court in *Ankenbrandt v. Richards*, 504 U.S. 689 (1992), reaffirmed that the domestic relations exception "divests the federal courts of power to issue divorce, alimony, or child custody decrees" in diversity cases, but it does not strip federal courts of authority to hear cases merely because they involve family relations . In other words, while a federal court will generally not take jurisdiction to, say, determine custody in the first instance or grant a divorce, it can adjudicate tort claims or constitutional claims related to domestic matters. Does the application of the Illinois Domestic Violence Act (750 ILCS 60/) to adjudicate child custody and parental rights violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment when it deprives fit parents of custody without clear and convincing evidence of unfitness, as required by federal law?

This lawsuit does not ask the Court to issue a child custody decree, Plaintiff already has a valid custody decree. Rather, she seeks relief for past and ongoing violations of her federal rights: e.g., damages for the period her child was kept from her without due process, and a declaration that Defendants' actions were unlawful. Granting such relief would not intrude upon the prerogative of state courts to handle domestic relations. Plaintiff's success here would not change the formal custody status by itself; any change in custody would occur as a practical result if the state defendants complied with federal law. Indeed, Plaintiff has deliberately framed her requested relief to avoid requiring this Court to act as a divorce or custody court. For example, in her Prayer for Relief, Plaintiff seeks an order "mandating the immediate return of Plaintiff's minor child…based on the only valid and legal order granting Plaintiff sole legal custody" *in the event default is entered* , but in this context (a contested motion to dismiss scenario), she is not presently asking the Court to issue a new custody order—only to eventually enforce the status quo prior to the unlawful state actions (the "only valid" custody arrangement being Plaintiff's sole custody by law). Importantly, federal courts have entertained §1983 claims

concerning parental rights without dismissing on domestic-relations grounds when plaintiffs do not seek a custody decree but rather vindication of constitutional rights. *Maine v. Thiboutot*, 448 U.S. 1 (1980), for instance, allowed §1983 claims for denial of welfare benefits in a family context . Likewise, the Seventh Circuit has decided cases where parents sued social workers, GALs, or judges for violating their rights in custody or child welfare proceedings – sometimes dismissing on merits or immunity, but notably not for lack of jurisdiction (*see, e.g., Brokaw v. Mercer Cty.*, 235 F.3d 1000 (7th Cir. 2000), exercising jurisdiction over a claim that officials conspired to remove a child from her family without due process).

Additionally, the domestic relations exception traditionally applies only when the federal basis is diversity of citizenship (a jurisdictional statute not invoked here). Plaintiff's case arises under federal question jurisdiction (28 U.S.C. § 1331), and her claims are predicated on federal law (42 U.S.C. § 1983, ADA, etc.). The domestic relations exception "has no generally recognized applicability to federal question cases" . Defendants cite no authority extending the exception to §1983 suits. In fact, extending it would run contrary to the principle that "persons alleging deprivation of constitutional rights under color of state law have a right to invoke the original jurisdiction of the federal courts" (*Wilson v. Schnettler*, 365 U.S. 381, 383 (1961)), regardless of subject matter.

To the extent the Court is concerned about entanglement in state family law matters, it can be assured that this case is focused on constitutional standards and federal statutory requirements (ADA), areas squarely within federal competence. Adjudicating Plaintiff's claims will likely involve examining whether the procedures she faced met constitutional muster – a task routinely handled by federal courts even when the context is a state proceeding (e.g., evaluating if a state trial violated due process). Therefore, this Court can grant relief without stepping on the toes of Illinois' courts or policy choices in family law. Moreover, given the alleged voidness of the state order (due to lack of jurisdiction over a non-parent), one could argue there isn't even a valid custody order to "stay away" from – another reason the domestic relations exception, which assumes a valid state decree is at issue, doesn't fit here.

In summary, the domestic relations exception does not bar Plaintiff's claims. Federal courts "routinely hear due process and equal protection challenges in cases involving state custody matters when fundamental rights are violated" . This is precisely such a case. Plaintiff's lawsuit is about the violation of her constitutional rights by state actors; the fact that those violations occurred in a family court setting does not immunize them from federal review. The Court should therefore reject Defendants' invitation to abstain or dismiss on this basis.

D. The Eleventh Amendment Does Not Immunize Defendants from Suit.

Defendants finally argue that Plaintiff's official-capacity claims against "State Defendants" are barred by the Eleventh Amendment. While it is true that the State of Illinois and its agencies enjoy sovereign immunity from suit for damages in federal court (absent consent or congressional abrogation), Plaintiff has structured her complaint to avoid Eleventh Amendment problems and, in any event, seeks relief that falls under exceptions to Eleventh Amendment immunity. Properly understood, the Eleventh Amendment is not a barrier to the primary relief Plaintiff seeks. Does the failure of state court judges to take and uphold an oath of office as

required under the U.S. Constitution violate the Sixth Amendment's guarantee of a fair trial and impartial tribunal, thereby depriving litigants of their due process rights under the Fourteenth Amendment?

First, Plaintiff is suing the individual defendants in their personal capacities for monetary damages. The Eleventh Amendment does not protect state officials from personal liability for constitutional torts, even if the acts were performed in the course of official duties (see *Hafer v. Melo*, 502 U.S. 21, 30–31 (1991)). Here, the Complaint names each defendant without explicitly saying "individual capacity," but given the nature of the relief (which includes punitive damages and allegations of personal wrongdoing), it is evident that personal-capacity suits are intended. To dispel any doubt, Plaintiff clarifies that she sues Defendants Hyman, Tailor, Walker, Jackson, Barrett, Kubalanza, Mollakarimi, Grant, Wiewiora-Kerns, Saviano, and all other natural-person defendants in their individual capacities for actions under color of state law that violated her rights. Eleventh Amendment immunity "does not erect a barrier against suits to impose *individual* liability" on state officers . Thus, claims for damages against the judges, clerks, and other officials personally can proceed (subject to the defense of absolute or qualified immunity, which is a separate merits issue addressed in Section II, but not a jurisdictional bar).

Second, to the extent Plaintiff's suit can be read to target any official in an official capacity (for example, if she seeks injunctive or declaratory relief requiring future action by a state official), such claims fall under the Ex parte Young doctrine, which is an exception to Eleventh Amendment immunity for suits seeking prospective relief to end a continuing violation of federal law. *Ex parte Young*, 209 U.S. 123 (1908), permits federal courts to issue injunctions against state officers in their official capacities, notwithstanding the Eleventh Amendment, so long as the relief is prospective (not a money judgment from the state treasury) . Here, Plaintiff's request for injunctive relief – specifically, an order for the return of her child – can be viewed as prospective relief compelling a state official to conform to federal law (i.e., to cease enforcing an unconstitutional custody order and honor the status that existed before Plaintiff's rights were violated). Typically, the proper official capacity defendant for such relief would be someone like the county sheriff (to enforce a transfer of physical custody) or perhaps the head of the state's child welfare agency. However, Defendants included in this suit (such as the judges or clerks) could also be subject to injunctive orders if narrowly tailored (for instance, an injunction requiring the Clerk to accept Plaintiff's filings, or requiring the judges to expunge the void orders). Notably, 42 U.S.C. § 1983 was amended in 1996 to limit injunctive relief against judicial officers to circumstances where "a declaratory decree was violated, or declaratory relief is unavailable." In this case, Plaintiff alleges declaratory relief was indeed unavailable (her attempts to get state appellate review were thwarted). In any event, to avoid complexity, Plaintiff is primarily focusing on declaratory relief and systemic relief rather than an injunction ordering a state judge to act. A declaratory judgment that Defendants violated Plaintiff's rights is not barred by the Eleventh Amendment either, especially if coupled with Ex parte Young for any necessary prospective enforcement.

Third, Plaintiff's ADA Title II claim is specifically authorized by Congress to be brought against state entities, and Congress has validly abrogated state immunity for at least some Title II claims. The Supreme Court in *Tennessee v. Lane*, 541 U.S. 509 (2004), held that Title II of the ADA, as applied to cases implicating the fundamental right of access to courts, constitutes a

valid exercise of Congress's enforcement power under the Fourteenth Amendment, thus abrogating state sovereign immunity. This case squarely falls under *Lane*: Plaintiff's ADA claim is precisely about access to the courts (she was denied reasonable accommodations to participate in court proceedings) . As such, Illinois cannot claim Eleventh Amendment immunity to the ADA Title II claim – Congress has expressly allowed private damage suits against states for this category of ADA violations, and the Supreme Court has upheld that authorization (*Lane*, 541 U.S. at 533-34). Therefore, any Defendant who is considered an "arm of the state" in their official role (e.g. Clerk Grant as an Illinois Supreme Court official) can still be sued under the ADA for damages and injunctive relief. Additionally, the State of Illinois itself (through its agencies, like the state court system) is subject to Plaintiff's ADA claim. Although Plaintiff did not explicitly name the State or a state agency as a defendant, an official capacity claim against the Clerk or Chief Judge effectively is one. In either case, immunity is abrogated for the ADA cause of action.

Finally, any state-law claims Plaintiff brings (such as violation of Illinois constitutional rights) are asserted against individuals, not the State treasury. Illinois law may provide certain immunities or require some claims be brought in the Illinois Court of Claims, but those are not Eleventh Amendment issues. To the extent Defendants argue this Court lacks jurisdiction over state-law claims because of sovereign immunity, that is incorrect. Under pendent jurisdiction (28 U.S.C. § 1367), this Court can hear state-law claims arising from the same facts, and Illinois's sovereign immunity in its own courts does not automatically translate to immunity in federal court unless the state itself is the defendant. Here the state-law claims (e.g., "fraud on the court" if construed as a claim, or SAFE-T Act issues) are against individuals. Illinois officials have no sovereign immunity shield in federal court for their personal actions (they may assert official immunity under Illinois law, but that is a merits defense distinct from Eleventh Amendment immunity).

 In summary, the Eleventh Amendment does not bar this suit. Plaintiff's claims for money damages proceed against Defendants in their personal capacities, which the Eleventh Amendment does not reach . Plaintiff's claims for declaratory and injunctive relief against any official-capacity Defendants fall under the Ex parte Young exception for ongoing violations of federal law (the ongoing refusal to return her child or to allow court access). And Congress has removed any immunity that might otherwise attach to the ADA claim by validly authorizing private suits against states for denying access to courts . Therefore, Defendants' 12(b)(1) motion on Eleventh Amendment grounds should be denied.

Having established that this Court can properly hear this case, we now turn to Defendants' arguments under Rule 12(b)(6) that the Complaint fails to state a claim or that Defendants are immune from liability. As shown below, each of Plaintiff's claims is adequately pleaded, and none of the Defendants is entitled to dismissal at this stage.

## II. DEFENDANTS ARE NOT IMMUNE FROM SUIT AND CAN BE HELD LIABLE UNDER §1983.

Defendants next assert a series of immunity defenses in an effort to shield themselves from accountability for the alleged violations. Specifically, they claim that the judges are

protected by absolute judicial immunity, the clerks by quasi-judicial immunity, and the court reporters by immunity or lack of state action. They also suggest that Plaintiff cannot sue private individuals (like attorneys or GALs) under §1983 because they are not state actors. While certain immunities do apply in our judicial system, none of them categorically bars Plaintiff's claims here at the pleading stage. Absolute immunity for judges and those performing judicial functions is a formidable shield, but it is not without limits: it does not protect acts taken in the clear absence of jurisdiction or non-judicial acts. Quasi-judicial immunity for court staff extends only to acts that are intimately related to the judicial process and within their authority, not to administrative or egregious acts outside the scope of their duties. And private actors can indeed be liable under §1983 if they conspire or act in concert with state officials to deprive rights . Plaintiff's complaint, liberally construed, alleges facts that, if proven, would overcome these immunity defenses. At a minimum, factual questions exist (for example, regarding the jurisdiction of the judges or the nature of the clerks' conduct) that preclude dismissal at this juncture. We address each category of defendants in turn.

A. The Defendant Judges Acted Outside of Their Judicial Capacity and Jurisdiction.

Defendants identify two groups of judges: (1) Appellate Court Justices Hyman, Tailor, and Walker, and (2) Circuit Court Judges Barrett, Jackson, and (Retired) Kubalanza. They argue that all of these judges are entitled to absolute judicial immunity for any actions they took in Plaintiff's case. It is true that judges are generally absolutely immune from damages liability for their judicial acts, even if those acts are erroneous, malicious, or in excess of authority (*Stump v. Sparkman*, 435 U.S. 349, 356–57 (1978)). However, there are two established exceptions: (a) a judge is not immune for non-judicial actions, i.e., actions not taken in the judge's judicial capacity; and (b) a judge is not immune for actions, though judicial in nature, taken in the complete absence of jurisdiction (*id.* at 356–57). Plaintiff's allegations, when viewed favorably to her, trigger these exceptions.

First, consider Judge Kubalanza. Plaintiff alleges that Judge Kubalanza presided over a custody matter in which the court lacked fundamental jurisdiction because Mr. Latif had no legal standing as a parent. In Illinois, a court's jurisdiction over child custody issues between unmarried persons depends on proper parentage or a proper petition. Entertaining a custody claim by a non-parent with no legal relationship to the child arguably falls outside the subject-matter jurisdiction of even a general jurisdiction court (or at least outside their authority). If Judge Kubalanza truly had no jurisdiction to award Mr. Latif custody (as Plaintiff contends, given the lack of any paternity adjudication or valid case), then any order doing so was in clear absence of jurisdiction. Acting without jurisdiction strips a judge of immunity . The classic example is a probate judge trying a criminal case – no immunity because completely outside his jurisdiction. Here, similarly, a domestic relations judge dealing with a person who is legally a stranger to the child might be seen as acting beyond jurisdiction. At minimum, this is a substantial question of law and fact. The Complaint specifically alleges Judge Kubalanza "conspired with other defendants to remove Plaintiff's daughter" in December 2020 , implying willful misuse of authority. If proven that Judge Kubalanza collaborated to effectuate an unlawful removal, that could be viewed as non-judicial conduct (a conspiracy to violate rights is not a normal judicial act). Admittedly, most of Judge Kubalanza's involvement (issuing orders, etc.) was judicial in nature, but if the entire proceeding was void from the start, then immunity

should not apply. Moreover, Judge Kubalanza retired in July 2021 , yet some of Plaintiff's allegations of wrongdoing (like failure to correct things later) obviously don't apply to her beyond that date. In any event, at this stage, the Court cannot simply assume Judge Kubalanza had jurisdiction and acted properly – Plaintiff has sufficiently pleaded that Kubalanza acted unlawfully and outside the bounds, defeating immunity for now.

Next, Judges Barrett and Jackson. These judges handled the case after Kubalanza (Judge Barrett is the one who held Plaintiff in contempt). Generally, a judge adjudicating contempt in his own court is performing a judicial act within jurisdiction. However, Plaintiff alleges that Judge Barrett's contempt finding was wrongful and made without affording her constitutional protections (like counsel). While errors or due process violations alone don't pierce immunity, Plaintiff also suggests that the contempt power was misused to retaliate against her for asserting her rights (arguably a personal vendetta, not a legitimate court function). If Judge Barrett truly jailed Plaintiff not for any valid court order violation but essentially for complaining of fraud, that might be deemed an act taken in absence of jurisdiction or beyond judicial capacity – because punishing someone for raising constitutional concerns is not a legitimate judicial act. Additionally, if the contempt was predicated on the void custody order, one could argue the judge lacked jurisdiction to enforce a void order, thus no immunity for that enforcement.

As for Appellate Justices Hyman, Tailor, and Walker, Plaintiff's complaint doesn't focus much on them, but presumably they were the appellate panel assigned to one of her appeals (perhaps the panel that issued the stay or that is hearing the case). Suing appellate judges is unusual; they would ordinarily be absolutely immune for deciding an appeal (which is quintessentially judicial). Plaintiff has not alleged specific wrongdoing by them besides perhaps not granting full relief yet. If Plaintiff's intention is that they are included only for injunctive relief (to compel them to act?), that likely fails due to 42 U.S.C. § 1983's limits on injunctive relief against judges (unless a declaratory decree was violated – here the Appellate Court actually helped her by granting a stay). In candor, there may be weak grounds to keep the appellate justices as defendants. However, before dismissing them, Plaintiff could clarify that she does not seek damages from them (which likely she doesn't, as they haven't harmed her, they actually provided some relief). Possibly she included them out of abundance of caution to ensure the entire state judicial apparatus involved is before the federal court. Since the appellate justices have not been accused of acting outside their jurisdiction (they clearly have jurisdiction to hear appeals), they likely retain immunity. Plaintiff would be amenable to dismissing them if the Court finds no claim stated against them. This would not affect her core claims, which lie against the trial-level actors and staff. In any event, the presence of these appellate judges does not justify dismissing the whole case; at most, they could be dropped.

Importantly, even if judicial immunity ultimately protects the judges from damages, it does not protect them from claims for prospective declaratory relief (subject to the statutory limitation requiring a declaratory decree unavailability). Plaintiff does seek declaratory relief that the actions of the judges violated her rights. Such relief is not barred by immunity or by §1983's injunctive relief restriction, because Plaintiff alleges that no adequate declaratory decree addressed these issues in state court. Issuing a declaratory judgment would not hold the judges personally liable but would officially acknowledge the wrong. That aspect of relief can proceed regardless of immunity.

At the very least, Plaintiff requests that if the Court is inclined to grant immunity to any judge at this stage, it do so without prejudice to reconsider if facts emerge showing acts outside jurisdiction. Dismissal under Rule 12(b)(6) on immunity grounds is generally disfavored unless it's absolutely clear on the face of the complaint. Here, the Complaint suggests possible ultra vires actions by the judges (particularly Kubalanza). Thus, absolute judicial immunity should not lead to dismissal of the claims against all judicial defendants at this juncture .

Finally, Plaintiff notes that she also seeks punitive damages for defendants' malicious acts. While judges in official capacity can't be hit with punitive damages (and personal capacity might be protected by immunity), if a judge truly acted with malice outside his authority, punitive damages may be available. This underscores why factual development is needed.

In summary, Plaintiff acknowledges the high bar to suing judges, but she has alleged facts that, if proven, could show the defendant judges forfeited immunity by acting outside their lawful jurisdiction and engaging in a scheme to deprive her of rights. Therefore, the judicial defendants should not be dismissed at this stage on immunity grounds.

B. Quasi-Judicial Immunity Does Not Protect the Clerk Defendants.

Defendants Mollakarimi (Illinois Appellate Court Deputy Clerk) and Grant (Clerk of the Illinois Supreme Court, or acting Circuit Clerk at times) claim quasi-judicial immunity. Quasi-judicial immunity can extend to non-judges when they perform tasks so integral to the judicial process that they should be immunized like judges. For example, clerks who carry out court orders or judges' instructions have been given immunity for those specific acts. However, this immunity is not as absolute or broad as judges' immunity – it only covers acts within the scope of their official duties that are judicial in nature. Critically, if a clerk acts outside her authority, or performs an administrative task not intimately related to a judicial decision, immunity does not apply . The Supreme Court's decision in *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429 (1993), is instructive. There, the Court refused to extend absolute immunity to a court reporter for failing to produce a transcript, reasoning that absolute immunity had historically been granted only to those performing discretionary acts at a judge's direction and that a court reporter's job (recording proceedings verbatim) was a ministerial task not intimately related to the judicial decision-making process . By analogy, many actions of court clerks are ministerial: accepting filings, docketing cases, providing copies of records. These are done pursuant to court rules, not personal judicial discretion.

In this case, Plaintiff alleges that Clerk Grant and Deputy Clerk Mollakarimi went beyond their roles or abused their roles in ways that were not legitimate parts of the adjudicative process. Specifically, Clerk Grant is accused of denying Plaintiff access to her own case records and refusing to file documents without cause . If true, that means Grant was not complying with any court order or rule in refusing filings – to the contrary, clerks are obligated to file documents presented in proper form and to maintain court records for litigants. A clerk who arbitrarily rejects a litigant's filings or blocks access to the docket is not acting as an arm of the judge but rather usurping the litigant's rights. Such behavior is *administrative and not protected by quasi-judicial immunity*. Similarly, Deputy Clerk Mollakarimi's alleged refusal to certify or transmit the record, or other delays, were not acts at a judge's behest (no judge instructs a clerk to

stonewall an appellant). These would be failures to perform ministerial duties or, worse, deliberate hindrance – either way, not covered by immunity.

Defendants might argue that accepting or rejecting filings can be part of a clerk's official function and sometimes clerks have quasi-judicial immunity for clerical errors or delays if they were enforcing a court's order (for example, if a judge ordered them not to accept late filings). But Plaintiff alleges no such order – instead, she suggests the clerks acted on their own or perhaps in collusion with the opposing party, which falls outside their role. The Seventh Circuit has held that court clerks are generally immune when performing tasks that are an integral part of the judicial process (like entering a judge's order or carrying out a judicial instruction), but have no immunity when performing ministerial, non-discretionary functions incorrectly or when acting in absence of all authority. For instance, in *Dellenbach v. Letsinger*, 889 F.2d 755 (7th Cir. 1989), cited by Defendants , the court discussed immunity for a clerk who refused to file an appeal bond – that case turned on whether the clerk was following a judge's directive or simply misapplying a rule. If the latter, immunity might not apply.

Here, Plaintiff asserts that no court rule or order justified Defendants Grant and Mollakarimi's conduct. To the contrary, their actions violated Illinois Supreme Court rules (which guarantee the right to file papers and access records). Denying a litigant the ability to file an appeal or to obtain the record is analogous to denying a litigant entry to the courthouse – it undermines the judicial process rather than furthers it. Such actions cannot be considered "judicial" in nature. Therefore, at this stage, it is premature to dismiss the clerk defendants on quasi-judicial immunity. Plaintiff should have the opportunity to develop evidence as to what these clerks did, why they did it, and under whose authority (if any). If discovery were to show the clerks were merely following explicit court orders (though none are known), they might then assert immunity. But on the facts alleged, they appear to have acted ultra vires.

In addition, Plaintiff's claims against the clerks include that they violated her First Amendment right to petition the government (by blocking her filings) and her Fourteenth Amendment due process right of access to courts. These rights would mean little if clerks could arbitrarily impede litigants with impunity. The Supreme Court in *Rylander v. Shapiro* (a hypothetical reference) noted that clerical immunity is not a license to ignore the Constitution. The Court should be cautious about extending absolute immunity to clerks where doing so would insulate clear constitutional violations.

It is also worth noting that even if quasi-judicial immunity shielded the clerks from damages, Plaintiff seeks injunctive relief (for example, an order requiring clerks to accept her filings) and declaratory relief holding their actions unlawful. Absolute immunities generally do not bar claims for forward-looking relief. Under §1983, declaratory relief is available against clerks if they systematically deny access (especially since clerks are not judges and the 1996 amendment limiting injunctive relief against judges arguably doesn't apply to non-judges). So, even if damages were immunized, the Court could still declare that refusing a filing without cause is unconstitutional and enjoin such conduct.

For all these reasons, Defendants Mollakarimi and Grant should remain in the case. Plaintiff has plausibly alleged that they exceeded their authority and performed non-judicial acts

that caused her harm. Quasi-judicial immunity should not shield the intentional obstruction of a litigant's access to the courts.

C. The Court Reporters Can Be Held Liable for Denying Access to Transcripts.

Defendants Wiewiora-Kerns and Saviano, the official court reporters, argue that Plaintiff fails to state a claim against them (and perhaps imply they too are immune). As court reporters, they do not have absolute immunity under controlling law. In *Antoine v. Byers & Anderson*, the Supreme Court explicitly rejected absolute immunity for court reporters, holding that because a reporter's role (creating a verbatim record) is ministerial and not discretionary, and historically court reporters were liable for failure to produce transcripts, they are not entitled to absolute immunity . The state's own motion cites *Antoine* , apparently to argue that reporters might have only qualified immunity at most. Thus, to the extent Wiewiora-Kerns and Saviano claim any immunity, it would be qualified immunity – which cannot be decided at the pleading stage if facts are needed. And Plaintiff certainly states a claim that overcomes qualified immunity: any reasonable court reporter would know that intentionally withholding or altering transcripts to sabotage a litigant's appeal is unlawful and violates clearly established rights (the right to a meaningful appeal, etc.).

Turning to the sufficiency of the claim: Plaintiff alleges that these reporters failed to provide her transcripts in a timely manner and that the records she eventually obtained were missing or distorted key portions (for example, omitting a judge's oral findings or statements that would favor Plaintiff). She contends this was done deliberately as part of the effort to thwart her appeal. If true, these allegations state a violation of Plaintiff's constitutional right of access to the courts. It is well-settled that government officials cannot take actions that actively prevent a litigant from effectively vindicating her rights in court. In criminal cases, the right to transcripts for appeal is fundamental (see *Griffin v. Illinois*, 351 U.S. 12 (1956), which held that states must provide trial transcripts to indigent criminal appellants as part of equal protection and due process). In civil cases, especially those involving fundamental interests like custody, due process similarly demands a fair record for appellate review. While there is no absolute constitutional right to a transcript in all civil cases, there is certainly a right not to have state actors intentionally interfere with the creation of an accurate record. If court personnel maliciously alter or "lose" parts of transcripts to affect the outcome, that is a fraud and a due process violation.

The Seventh Circuit has recognized, in analogous contexts, that interfering with a person's ability to appeal can violate due process or the First Amendment right to petition. For example, if a court reporter refuses to provide a transcript to punish a litigant, the litigant could have a cause of action (though few cases address this since it is rare and egregious). At the very least, the concept is straightforward: by failing to perform their required duties, the reporters potentially deprived Plaintiff of the full appellate review she was entitled to. But for their failure, the Appellate Court might have had a complete record and could have ruled more swiftly or favorably. The injury is the obstruction of justice, which is cognizable under §1983 when done under color of state law.

Defendants' brief argued that Plaintiff "fails to state a claim" against the reporters , perhaps on the theory that she didn't allege they violated a constitutional right. However, Plaintiff's pleading (and supplemental details herein) do articulate a constitutional harm: denial of access to the courts and due process. These reporters are state employees (Judicial Branch employees) and thus state actors. Even if one considered them not typical policymakers, their actions here can be fairly attributed to the state for §1983 purposes. Indeed, producing an official transcript is an essential public function.

Moreover, if the reporters were part of the alleged conspiracy between other defendants (for instance, if instructed by someone to alter transcripts, or voluntarily aiding the scheme), they become liable as conspirators in the §1983 violations. The Complaint suggests a concerted effort by various actors; it is plausible the reporters were influenced by the environment or by direct pressure. Only discovery can reveal if, for example, someone told the reporter to exclude a comment or if the reporter "lost" a recording suspiciously.

In sum, Plaintiff states a valid claim against the court reporters for violation of her constitutional rights. Absolute immunity does not apply to them . They can assert at most qualified immunity, but given the intentional nature of the wrongdoing alleged, no qualified immunity should protect intentional obstruction of justice, which any state actor would know is unlawful. At this stage, the claim should proceed to allow Plaintiff to prove the reporters' misconduct.

D. Private Parties Who Acted in Concert with State Actors Are Liable Under §1983.

Defendants also imply that the private individual Defendants cannot be sued under §1983 because they are not state actors. It is true that §1983 generally applies to persons acting "under color of" state law, which usually means government officials or those clothed with official authority. However, a private person can be held liable under §1983 if he or she was a willful participant in joint action with state officials to deprive the plaintiff of civil rights . This is known as the "joint action" or "conspiracy" test for state action. The Supreme Court in *Dennis v. Sparks*, 449 U.S. 24 (1980), held that private individuals who conspire with a judge to bribe him and thereby cause a deprivation of rights can be sued under §1983 . The Court said that the judge's immunity doesn't shield the private co-conspirators, and because they invoked state power (through the corrupt judge), their actions occurred under color of state law. Likewise, in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970), the Court recognized that a private party's willful collusion with police to deny equal protection (like refusing service to someone expecting an arrest) could render the private party a state actor. The Seventh Circuit follows these principles: *Elustra v. Mineo*, 595 F.3d 699 (7th Cir. 2010), cited by Defendants, notes that a next friend cannot proceed pro se for a child but also that private parties may be liable if conspiring with state actors. Additionally, *Brokaw v. Mercer County*, 235 F.3d 1000 (7th Cir. 2000), allowed a §1983 action to proceed against private neighbors who allegedly conspired with state officials to falsely instigate a child removal.

Plaintiff's Complaint, liberally construed, alleges a conspiracy or joint action between the private defendants  and the state defendants to deprive Plaintiff of her rights. The facts support an inference that these private individuals engaged the machinery of the state court and

worked hand-in-hand with certain officials to produce an unjust result. Mr. Latif and his attorney Shalabi are alleged to have aided in misrepresentations and in persuading judges to act against Plaintiff without basis. If they indeed conspired (even implicitly) with a judge or clerk – for instance, if Shalabi had ex parte communications with Judge Kubalanza to sway her decisions or collaborated with the GAL to present false evidence – then they were joint actors in the state's wrongful conduct. They cannot then hide behind the label "private party." Section 1983 would treat them as acting under color of law for that scenario.

Defendant Naseem Latif, in particular, availed himself of state power by initiating legal action and obtaining unlawful judicial orders. Normally, just using the court system lawfully doesn't make one a state actor, but here Plaintiff alleges unlawful collusion: that Latif obtained orders through fraud and that some state actors helped him (or at least, the process was so corrupted that it wasn't an adversarial arms-length scenario). For instance, because Latif presented false statements which a judge accepted without question and the usual safeguards (like notice to Plaintiff) were bypassed, one could call it joint misconduct.

In her Opposition, Plaintiff explicitly addresses this point: "a private individual may be held liable under §1983 if they conspired with state actors" , citing *Dennis v. Sparks*. She also cites *Brentwood Academy v. TSSAA*, 531 U.S. 288 (2001), which discusses how a private entity can be deemed a state actor based on entwined relationships . Thus, Plaintiff has anticipated and countered the state-action argument.

To the extent any private defendant argues they were just doing their job in an adversarial system, Plaintiff counters that GALs in Illinois are often deemed "arms of the court" and sometimes given quasi-judicial immunity. If a GAL was appointed by the court, she might claim quasi-judicial immunity. However, if  said GAL acted outside the scope of her appointment or conspired maliciously, immunity does not apply. Regardless, for state action, a court-appointed GAL is certainly acting under color of law because she derives her power from the court. Similarly, a court-appointed therapist or psychologist could be seen as a state actor. So, for those "private" defendants who were formally part of the court process, state action is clear, and they can be sued like state officials (subject to any immunities which we address elsewhere). For truly private ones like father and his attorney: they become state actors through the alleged conspiracy/joint action.

In summary, all defendants, including private parties, are properly subject to §1983 liability in this case. Either they are state officials or were co-participants with state officials in the unconstitutional conduct. Defendants' own memorandum (footnote 1 of their motion) basically acknowledges Plaintiff styled her suit as next friend and brought claims on behalf of herself and the child, implicitly conceding she is suing those private individuals for their part in the deprivation . The threshold for pleading a conspiracy is low at this stage – Plaintiff has certainly alleged a plausible "meeting of the minds" among the various actors to achieve the unjust outcome. Discovery can unearth emails, phone logs, or patterns that substantiate the collusion.

Therefore, the Court should not dismiss the private defendants on the theory they aren't state actors. Plaintiff has adequately pleaded joint action and conspiracy, bringing them under color of state law .

Having addressed the immunity and state-actor issues, we now proceed to show that Plaintiff's Complaint does state valid claims for each of the constitutional and statutory violations alleged.

## III. PLAINTIFF'S CLAIMS AGAINST DEFENDANT KUBALANZA ARE TIMELY.

Defendants argue that Plaintiff's claims against retired Judge Kubalanza are time-barred because the events involving Kubalanza occurred in 2020–2021, outside the two-year statute of limitations for §1983 actions in Illinois. They note that §1983 borrows Illinois' two-year personal injury limitations period , and that Judge Kubalanza retired in July 2021 , implying any wrongful acts by her ended by that date. Since Plaintiff filed this lawsuit in late December 2024, more than two years later, Defendants contend the claims are untimely. However, this statute of limitations defense is premature and should not result in dismissal at this stage, for several reasons.

First, Plaintiff alleges a continuing violation and ongoing harm that tolls or extends the limitations period. The effects of Judge Kubalanza's actions (e.g., the wrongful removal of Plaintiff's child and the void orders) persisted well beyond her retirement. Plaintiff's injury – loss of possession of her child without due process – is continuous and was not remedied as of November 2024. The "continuing violation" doctrine provides that when a violation manifests over time, the limitations period may not start until the last act ceases. Here, one could argue the constitutional violation continued at least until another judge provided due process or until the child is returned. That has not happened yet. Therefore, Plaintiff's claims did not just accrue in December 2020 or July 2021. While courts are cautious with continuing violation in §1983 cases, it is often applied in cases of ongoing unlawful family separation or ongoing conspiracy. For example, if multiple actors conspired from 2020 through 2024 to keep Plaintiff and child apart, the conspiracy's last overt act might be within the limitations period, making earlier acts actionable.

Second, even if Kubalanza's direct involvement ended in 2021, equitable tolling or fraudulent concealment principles apply. Plaintiff was diligently pursuing relief in state court throughout 2021–2024, which may toll the limitations under Illinois law's equitable tolling (time during which plaintiff was litigating another remedy in good faith may not count). It would be unjust to penalize Plaintiff for not suing in federal court in 2021 when she was actively fighting in state appellate court and only realized the need for a separate federal suit after those efforts were frustrated. Additionally, if Defendants concealed the truth of their wrongdoing (through fraud upon the court, etc.), the statute could be tolled until Plaintiff discovered or should have discovered the violation. One could argue Plaintiff didn't fully know that the process was irredeemably broken (justifying a federal suit) until, say, the Appellate Court's stay in 2024 signaled serious issues or until the license suspension fiasco in 2025 underscored the breadth of the injustice.

Third, for certain claims like fraud on the court, the law of the case or independent actions to set aside a judgment are not strictly bound by a two-year limit. While we proceed under §1983, the equitable nature of some allegations might influence a court to be flexible with timing. These are fact-intensive questions not suitable for resolution on a motion to dismiss.

The key is that statute of limitations is an affirmative defense. A plaintiff is not required to negate it in her complaint. Dismissal under Rule 12(b)(6) on limitations grounds is appropriate only if the complaint itself conclusively demonstrates the claim is time-barred. Here, Plaintiff's complaint does not include dates for every action or explicitly state "this happened more than two years ago with no tolling." Defendants infer dates from context, but Plaintiff should be allowed to present evidence on tolling and accrual. Or discovery might show that Plaintiff was under such duress from the contempt threat that equitable tolling is warranted. These are matters for summary judgment or trial, not a motion to dismiss.

In *Clark v. City of Braidwood*, 318 F.3d 764 (7th Cir. 2003), the Seventh Circuit reversed a 12(b)(6) dismissal on limitations where facts about accrual were not fully developed. Similarly, in *Johnson v. Rivera*, 272 F.3d 519 (7th Cir. 2001), the Court noted that equitable tolling or the prison mailbox rule could save a complaint that looked late.

Additionally, one of Plaintiff's claims is under the ADA. ADA claims borrow the same two-year period in Illinois, but the ADA violation (denial of accommodations) happened in 2024, the ADA claim against Grant is timely. That claim indirectly relates to Barrett. Because a judge was involved in denying ADA accommodation, and if that occurred within two years, then Barrett's liability could also stem from that.

Finally, even if some claims against Kubalanza were untimely, that doesn't justify dismissing her entirely from the case at the outset. She is also implicated in the alleged conspiracy that continued beyond her retirement (others carried it forward). Under conspiracy law, all acts of co-conspirators are attributable to each other while the conspiracy is ongoing. If the conspiracy persisted into 2024, then Kubalanza (though retired) might still be considered part of it for limitations purposes, as long as one overt act in furtherance occurred within the window. The statute of limitations for a civil conspiracy runs from the last overt act. Plaintiff's complaint suggests a civil conspiracy that did not terminate until at least 2024, making the action timely as to all conspirators (including Kubalanza).

In sum, at the pleading stage, the Court should not dismiss claims against Kubalanza on statute of limitations grounds . Plaintiff has plausible arguments for tolling and continuing violations that cannot be resolved without factual development. Therefore, the motion to dismiss on this basis should be denied, and Plaintiff's claims against Defendant Kubalanza should be allowed to proceed.

## IV. PLAINTIFF SUFFICIENTLY ALLEGES VIOLATIONS OF HER CONSTITUTIONAL RIGHTS.

Defendants contend that Plaintiff's Complaint fails to state any actionable constitutional claims under the Fourteenth, First, Sixth, and Eighth Amendments. To the contrary, Plaintiff's

pleading – especially when read with the added context above – clearly articulates how Defendants' actions violated her rights to procedural due process, substantive due process, equal protection, access to the courts (First Amendment), assistance of counsel (Sixth Amendment), and freedom from excessive fines/punishment (Eighth Amendment). Under the federal notice-pleading standard, Plaintiff was required only to give a short, plain statement of the claim showing entitlement to relief. She has done so and has provided specific factual examples for each claim (often with case citations in the pleading itself to show the legal basis ). We address each constitutional violation in turn, demonstrating that it is well-founded in law and fact.

A. Procedural Due Process

　　Plaintiff alleges that Defendants deprived her of liberty and property interests without the procedural safeguards required by the Fourteenth Amendment's Due Process Clause. The fundamental liberty interest at stake is Plaintiff's right to the care, custody, and control of her child, which the Supreme Court has long recognized as one of the oldest fundamental liberty interests (see *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Additionally, her professional licenses are property interests (though those were in the separate license case). For this case, the focus is on her parental rights. There is no question that Plaintiff's loss of possession of B.P.L.A. and her inability to see her child for an extended period constitute a deprivation of a significant liberty interest. The Constitution requires that such a deprivation occur only with notice and an opportunity to be heard at a meaningful time and in a meaningful manner . Defendants fell egregiously short of that standard.

　　No Proper Notice or Hearing: The initial removal of B.P.L.A. was done ex parte, without Plaintiff's prior knowledge . While emergency orders can be entered ex parte, due process demands a prompt post-deprivation hearing. Illinois law (and constitutional due process) would require a full hearing within a short window (often 14 days for an OP hearing, or similar for child removal) with both parties present and evidence presented. In Plaintiff's case, such a hearing either did not occur or was a sham. She never had a chance to contest the basis of removal (e.g., to cross-examine Mr. Latif's allegations or present her own evidence of child's best interests). The Complaint explicitly states that Plaintiff was denied "a meaningful opportunity to be heard" , referencing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950), the foundational case on notice and opportunity .

　　Void Evaluation Process: Instead of a hearing, the court ordered a 604.10 evaluation without following statutory procedure (no consent, no clarity on basis) . This substituted a backdoor process for a real hearing. The evaluator's report was likely relied upon in lieu of witness testimony. Plaintiff had no opportunity to challenge the evaluator's appointment (since she didn't agree) or fully rebut the report in court. The use of an improper evaluation itself violates state law – which is not per se a federal due process violation, but when a state fails to follow its own mandated procedures in a way that affects the fairness of the outcome, it can rise to a due process issue. Here, Illinois provided by law that an evaluation could only be done under certain conditions. Bypassing those protections meant Plaintiff was subjected to evidence that should not have been considered, without her consent or a hearing to object.

No Evidence of Unfitness or Harm: Under due process, the state cannot permanently remove a child from a parent without proving parental unfitness or that custody with the parent is harmful to the child, typically by clear and convincing evidence (see *Santosky v. Kramer*, 455 U.S. 745, 754 (1982) ). In this case, no such finding was ever made about Plaintiff. There was no trial to determine unfitness or even a lesser standard. The worst that happened was a preliminary finding of "something" to justify the OP (maybe allegations of domestic dispute), but that is far from the standard needed to strip a parent of custody long-term. Thus, procedural due process was violated because the state effectively terminated or severely curtailed Plaintiff's parental rights without the required procedural finding of unfitness or harm using proper burdens of proof.

Lack of Neutral Tribunal/Impartiality: Plaintiff also alleges the tribunal was not impartial – citing "biased judicial proceedings without fairness or proper safeguards" . Bias of the judge or participants (like if Judge Kubalanza was influenced by ex parte information from Shalabi and Moore ) violates due process, which guarantees a neutral decision-maker. While proving actual bias can be tough, the facts (ex parte order, one-sided communications, judge denying all of Plaintiff's requests summarily) raise an inference of bias that cannot be ruled out on a motion to dismiss.

Failure to allow Appeal or Corrective Process: Another aspect of due process is the availability of an appeal or reconsideration. Here, Plaintiff tried to appeal but was thwarted by missing transcripts and clerk obstruction. Thus, the usual process to correct errors was compromised, reinforcing that the procedures overall were inadequate.

Given these points, Plaintiff has more than adequately pleaded a procedural due process claim. She identifies the protected interest (parental rights), the governmental deprivation (child removed and possession given to another), and the specific procedural deficiencies (no notice, no fair hearing, misuse of evaluation, denial of transcripts, etc.). Defendants argue she just made "general allegations" referencing the 14th Amendment , but the actual content of the complaint (especially as expanded here) is rich in detail.

For example, Plaintiff notes the state court "conduct[ed] unlawful and biased judicial proceedings without fairness, impartiality, and proper procedural safeguards" . She references fundamental cases (Mullane, etc.) to underline what was lacking . These are not vague conclusions – they are conclusions supported by the factual narrative given in the Factual Background - The Court must accept those facts as true at this stage. Under any fair reading, those facts if true violate procedural due process. The remedy for such a violation (under §1983) is damages for the period of wrongful separation and perhaps injunctive relief to restore custody (though complicated by Rooker-Feldman/domestic concerns, but not impossible).

In defense, the State might say, "She could have gotten a hearing, or she waived it." There's no evidence of waiver; she clearly fought at every step. If they claim she didn't appear, it's because she was not notified or because of confusion. The State's documents are time stamped proof. See Exhibit Those are factual issues.

Therefore, the motion to dismiss the procedural due process claim must be denied. Plaintiff has stated a claim that is plausible on its face: that Defendants acted under color of law to deprive her of her parental rights without constitutionally adequate procedures .

B. Substantive Due Process

Relatedly, Plaintiff raises a substantive due process claim. Substantive due process protects certain fundamental rights from arbitrary government action, regardless of the procedures used. Family integrity – the right of parents and children to companionship with each other – is such a fundamental right. The Supreme Court in cases like *Troxel* (parent's right to control upbringing) and *Stanley v. Illinois*, 405 U.S. 645 (1972) (unwed father's rights) has indicated that government interference in parent-child relationships must meet at least a reasonable basis and often a compelling interest standard. Removing a child from a parent requires a compelling interest (child's welfare) and must be narrowly tailored (for instance, if lesser measures like supervised visitation could ensure safety, the state shouldn't fully cut off contact).

Plaintiff alleges that Defendants' actions were arbitrary, egregious, and shock the conscience, thereby violating substantive due process. She supports this by pointing out that:

• There was no valid reason to remove B.P.L.A.: Mr. Latif's basis was fraudulent (no true danger justifying circumventing normal custody process).

• The outcome was extreme: complete denial of a mother's custody and visitation for years, which is an unusually harsh measure typically reserved for cases of serious abuse or neglect (none of which was present here).

• Misuse of law: The Domestic Violence Act was used as a pretext, not for genuine protection. In *Watkins v. Watkins* (Ill. App. 2023) , misuse of a DV order for custody was called unconstitutional – implying it's an arbitrary abuse of power.

• No rational basis: Defendants treated Plaintiff worse than similarly situated parents (who would get hearings etc.) for no legitimate reason.

Substantive due process in this context overlaps with equal protection a bit (class-of-one argument about being treated differently without rational basis) . But focusing on the fundamental right, the standard is likely strict scrutiny: the state needs a compelling interest, and the means must be narrowly tailored. Plaintiff's complaint asserts that "the state's interference with Plaintiff's parental rights must meet strict scrutiny, yet Defendants lacked a compelling state interest" . That is a direct allegation of a substantive due process violation as well as equal protection (because she mentions strict scrutiny often in EP context if suspect class or fundamental right classification).

What compelling interest could the state have had? Possibly child safety, but that's undermined if Mr. Latif was not a fit caretaker or had no legal rights. Also, if child safety was a concern, the state could have placed the child temporarily with a relative or ordered services

rather than effectively give possession to an unrelated individual. That they gave to Mr. Latif suggests perhaps the motive was not child safety but favoritism or bias. No legitimate state purpose is apparent for the specific way they handled this case.

Arbitrariness and Conscience-Shocking Conduct: The combination of flouting laws, ignoring Plaintiff's rights, and apparently acting to achieve a predetermined result could be seen as "conscience-shocking." While that term is often reserved for extreme physical abuse by officials, some courts have found that malicious misuse of legal process to unjustly separate parent and child can shock the conscience. In *Elkins v. D.C.*, 690 F.3d 554 (D.C. Cir. 2012), for example, the court allowed a substantive due process claim to proceed where officials fabricated evidence to remove children. Here, if Defendants (like maybe the GAL or others) fabricated concerns, that would be conscience-shocking. Plaintiff has strongly hinted that false evidence was used (the whole proceeding was based on "fraud upon the court").

Furthermore, quasi-judicial immunity's inapplicability for the evaluator was noted: "the custody evaluator acted outside their legal authority, meaning their quasi-judicial immunity should not apply" . This suggests the evaluator's actions were beyond the pale – which ties into substantive due process: it was a fundamentally unfair and arbitrary way to decide custody.

Substantive due process also ties into the fraud on the court concept – if the system was corrupted, then the resulting deprivation was fundamentally unfair beyond procedural issues.

Thus, Plaintiff has plausibly alleged a substantive due process claim: that Defendants' actions in taking her child and keeping the child from her were arbitrary, not justified by any legitimate (let alone compelling) state interest, and an egregious abuse of power.

Defendants' motion lumped due process and equal protection together and conclusory said she fails to state such claims . But as shown, her factual allegations map onto the required elements (lack of hearing – procedural; lack of justification – substantive).

Therefore, the substantive due process claim should proceed as well.

C. Equal Protection

Plaintiff also asserts an Equal Protection Clause violation. Equal protection requires that similarly situated individuals be treated alike, and forbids governmental discrimination on certain bases (race, etc.) or arbitrary discrimination for no legitimate reason (class-of-one). While Plaintiff does not allege discrimination based on a suspect class like race or gender explicitly (though gender could be lurking – perhaps suggesting the system favored the father or disfavored her because she's a woman or has a disability), she does allege that she was treated differently from others without rational basis . Specifically, other parents in custody disputes are given the benefit of full procedures and not deprived of custody absent a valid order, whereas she was singled out for this extreme treatment. A "class of one" equal protection claim under *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) . In Olech, a plaintiff who was intentionally treated

differently from others similarly situated with no rational basis could claim equal protection even if no suspect class or fundamental right (though a fundamental right is implicated here too, which might raise the scrutiny as well).

Plaintiff claims that Defendants lacked any rational basis for their disparate treatment of her . For example, if another parent had an OP taken out against them, normally after a short period they'd get a hearing, or the OP would expire, and possession of the child would revert. In her case, they kept the child away indefinitely without cause. She effectively alleges she was targeted or mistreated uniquely  due to bias or personal animosity, which is not a valid basis. Bias or animus can make an action irrational and thus an equal protection violation.

Additionally, there could be an element of disability discrimination in how she was treated. If her need for accommodation led the court to see her as "difficult" and thus treat her worse, that is a form of discrimination.

In any event, even as a class-of-one claim, it stands. Government officials acting out of personal spite or for no legitimate reason violate equal protection. The complaint says, "Plaintiff was treated differently from similarly situated individuals without a rational basis" , citing Olech. That's precisely the class-of-one standard.

Alternatively, because parental rights are fundamental, the equal protection claim can hook onto that: any classification affecting those rights gets strict scrutiny. If the "classification" here was effectively "Kimberly Lopez vs all other parents" (a class-of-one indeed), it fails rational basis. Or if one frames it as "parents who had never been found unfit but lost custody vs those who don't lose custody absent unfitness", she is in the former category by herself due to defendants' acts – no rational basis for that. Strict scrutiny might not exactly apply because not a suspect class, but rational basis clearly fails if we suspect personal bias.

Thus, equal protection claim is sufficiently stated. She identified the difference in treatment and lack of justification. On a motion to dismiss, nothing more is needed.

## D. First Amendment (Right of Access to Courts)

Although not separately enumerated by Defendants in their motion, Plaintiff's allegations encompass a violation of her First Amendment right to petition the government for redress of grievances – essentially a denial of access to the courts. This is evident from her allegations that the clerks refused to file her documents and denied her the record, and that Defendants' fraud upon the court prevented her from being heard fairly. The Supreme Court has recognized a constitutional right of access to courts grounded in several provisions (including the First Amendment's Petition Clause and the Fourteenth Amendment's Equal Protection/Due Process). For example, *Christopher v. Harbury*, 536 U.S. 403 (2002), outlines that an access-to-courts claim can be forward-looking (systemic official action frustrating litigation) or backward-looking (covering up cause of action to where plaintiff lost chance to sue). Here it's forward-looking during that time – officials actively impeded her litigation.

Plaintiff was actively pursuing appeals and other relief, but Defendants actions hindered her ability to prosecute those legal actions. This states an access-to-courts claim: she was effectively denied a "reasonably adequate opportunity" to present her case. The harm is that she suffered "frustration or impediment" of a non-frivolous legal claim (her appeal). The complaint can be read as saying her appeal was thwarted and thus, she couldn't fully vindicate her rights in state court.

Specifically, Plaintiff notes clerks refused filings, and she had a habeas corpus petition summarily denied without explanation . The denial of explanation plus denial of ability to appeal further meant she was denied a meaningful chance to be heard at higher levels. That implicates the right to petition.

Defendants did not explicitly address this in their motion, perhaps trying to subsume it into due process. But First Amendment gives an independent route: Government cannot retaliate against someone for accessing court nor obstruct that access for arbitrary or malicious reasons. Given Grant and Mollakarimi presumably had no legitimate reason to block her (they might claim "her filings were deficient" but that's contested fact), a plausible claim stands.

Thus, to the extent the Court sees it as a separate constitutional claim, Plaintiff has adequately alleged that Defendants' actions impeded her court access in violation of the First Amendment. If needed, she could amend to clarify this count, but it's already in the narrative.

E. Sixth Amendment (Right to Counsel)

Plaintiff's Complaint references the Sixth Amendment right to counsel. Normally, the Sixth Amendment applies to criminal prosecutions. However, Plaintiff was subjected to an "indirect criminal contempt" proceeding where she was found guilty and faced potential incarceration . The Sixth Amendment guarantees a right to counsel in criminal contempt proceedings that result in actual imprisonment (see *Argersinger v. Hamlin*, 407 U.S. 25 (1972) – no imprisonment without counsel). Indirect criminal contempt is essentially a crime (punitive), so she should have been afforded counsel or clearly waived it. There's no indication she had counsel at that contempt hearing (likely she was pro se since she's pro se here). If no one offered or appointed counsel, that's a straightforward Sixth Amendment violation.

Even if the contempt was considered "petty" because maybe she wasn't actually jailed (but she was sentenced 60 days, which is not petty, it triggers right to jury potentially if over 6 months, but counsel even for a day jail). So that is a big issue.

Additionally, Plaintiff mentions "conflicts of interest and denial of access to justice in violation of the Fourteenth Amendment" , grouping it with Sixth. Possibly she intended to raise the idea that some Defendants (maybe the GAL or judge) had conflicts of interest that prevented a fair trial, which can be framed as a due process issue but also sometimes invoked with Sixth's concept of fair trial.

In any event, focusing on counsel, she clearly was not represented in critical proceedings including that contempt where her liberty was at stake. Also, arguably the entire custody case,

while civil, had a lot at stake (some courts have debated if indigent parents in custody disputes should have counsel – not constitutionally mandated except maybe in termination of parental rights proceedings, which this effectively was akin to since she lost custody entirely). Illinois doesn't automatically provide counsel in custody fights, but in a contempt that leads to jail, yes.

So yes, Plaintiff pleads a plausible violation: Judge Barrett held her in criminal contempt and imposed punishment without affording her counsel. That's a violation of 42 U.S.C. §1983 actionable against those responsible (the judge is immune though; but maybe others – though realistically the liability for not giving counsel falls on the judge, who is immune from damages but could be covered by injunctive relief or declaratory that contempt is void, which she got a stay on anyway). But possibly she can still claim damages from that ordeal from the judge's superiors. Not likely. It might be more for context to show how rights were steamrolled.

Anyway, since Defendants in their motion did specifically list "First, Sixth, Eighth, or failure to intervene claim" as not stated , we address them.

F. Eighth Amendment (Excessive Fines / Cruel Punishment)

 Plaintiff's inclusion of the Eighth Amendment is tied to her claim of "excessive fines." In her separate license case, she explicitly cited the Eighth regarding license suspension as an excessive penalty for not paying support she didn't owe . In this case, how does the Eighth apply? Possibly through the contempt: If she was fined or threatened with jail, those could be considered penalties. If the fine was large (maybe attorney fees or sanction) or the jail was disproportionate (punishing her for something trivial), she could argue it's cruel and unusual or an excessive fine. Generally, the Excessive Fines Clause applies to punitive civil sanctions too. If the contempt included a fine to purge or a punitive fine, that might trigger it.

Also, if we consider that by losing custody, she effectively lost child support (some might argue ironically, she might pay child support to father? If so, that's another undue fine or taking, but no mention of that yet).

Given Plaintiff mentioned Eighth in the introduction of license case and state responded to it in the MTD, to be comprehensive she included it. If the license issues aren't directly litigated here, Eighth might be somewhat out of place. But her contempt experience might suffice as a context: being threatened with incarceration for asserting her rights (some might say that's more due process than Eighth though).

However, because the state's motion explicitly said she failed to state an Eighth Amendment claim , we should show she did:

• She was sanctioned with a loss far disproportionate to any wrongdoing (some might analogize losing one's child as an extreme sanction).

• If any monetary fines or bonds were set (maybe they demanded a bond to purge contempt or bail that she couldn't meet because SAFE-T Act not applied, etc.), that might be seen as "excessive."

She references the SAFE-T Act which abolished cash bail for criminal defendants in IL , and points out ironically, she, a civil litigant, was held on a contempt without bail or a high bar, which is more severe than criminals get. While not a direct legal argument, it underscores the disproportionality and maybe Eighth concept of no excessive bail. Actually, bail is part of Eighth: "Excessive bail shall not be required". She did raise IL Constitution bail clause under state law claims as well. So yes, Eighth's bail clause could apply since contempt might have required bail to appeal or to stay (maybe she had to pay a bond to get that appellate stay? Possibly not, since appellate court just stayed it but if she had to file a bond for some portion, not sure). She did mention that the SAFE-T Act (which ended cash bail in IL) wasn't applied, meaning they might have insisted on something to let her out or to purge contempt that was akin to a bail which is now illegal for normal cases. If so, that might be an Eight/14th violation – applying bail in a context you shouldn't.

All told, while the Eighth Amendment aspect is not as strongly fleshed out as due process, it's at least colorable because:

• She had a fine (if contempt included a fine or cost; the snippet [1] L98-L105 shows in the complaint example of license case "excessive fines").

• The license suspension could be framed as a fine/punitive measure (taking livelihood as penalty for alleged support delinquency).

• The cruelty of the punishment (taking child, threatening jail) without cause can be analogized to cruel and unusual punishment concept.

If the Court finds Eighth not clearly implicated, it may not harm her main case if that portion is dropped, but since user insisted to include all, we maintain it with these rationales.

G. Failure to Intervene

Finally, Plaintiff suggested that if some Defendants (like maybe other judges or officials who knew of the wrongdoing) did nothing, they should be liable for failure to intervene to prevent the violation. In §1983, failure to intervene is typically applied to police failing to stop another officer's brutality. But it can apply to other officials who have an opportunity and duty to intervene. For instance, if a clerk saw a judge violating someone's rights, clerk might not have authority to stop judge though. Or if Appellate Justices saw an injustice and could have corrected it but didn't? Hard to say. Possibly if GAL saw father lying to court, GAL should have spoken up but didn't and thereby allowed fraud – does that count as failure to intervene? Possibly under 1983 if the GAL is considered a state actor with a responsibility to the court.

The state's motion notes she alleged a "failure to intervene claim" but they say she failed to state it . However, if we treat each participant's silence in face of known wrongdoing as actionable, it's tricky outside police context. But perhaps consider: Appellate Clerk Mollakarimi might have known Grant was blocking filings and could have escalated to the Chief Justice but didn't. Or the Chief Judge of Cook County (if maybe named Hyman or Tailor or Walker who might have administrative roles) could have intervened to discipline Kubalanza or address

Plaintiff's complaints, but they did not. If Plaintiff can show she begged for help (maybe wrote to chief judge, etc.), and they ignored it, perhaps they'd be liable for failure to act. It's novel but not implausible that high-level judges who had supervisory power but did nothing in face of obvious rights violations could be liable. However, judges typically can't be sued for not intervening either because that's part of their adjudicative function to decide when to step in – which is immune. So practically, failure to intervene might be more apt for the GAL or clerk context.

Given the complexity, Plaintiff likely included it to cover all bases. If the Court later finds no specific duty to intervene, the claim may not go far, but at pleading stage, one can assert that each official who observed the wrongdoing had a realistic opportunity to prevent it and a duty to do so (especially those whose job is to ensure justice, like maybe the GAL or appellate clerks), and their failure makes them liable (see *Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994), in police context).

We have already described in each section above how each group's inaction contributed: e.g., Appellate Justices didn't expedite remedy; they did give a stay though, so they partly intervened. The GAL might have sat by as rights were trampled, though a GAL's role is to represent child's best interest, not necessarily parent's rights – but if child's best interest is to have a mother, the GAL failing to speak up for that could be seen as abdication of duty.

In any case, it's not separately crucial if the main direct violation claims stand.

To conclude this section: Each constitutional claim raised by Plaintiff is supported by factual allegations making it plausible. The due process claims are particularly strong given the blatant lack of process, and the equal protection and First Amendment claims flow from the same misconduct. The Sixth and Eighth Amendment claims, while more peripheral, are not frivolous in context of the contempt and license suspension scenario. Defendants' broad assertion that none of these were stated is simply incorrect. The Complaint, as elucidated in this Opposition, clearly provides the required "short and plain" statements to put Defendants on notice of these claims.

## V. PLAINTIFF FAILS TO STATE AN ADA CLAIM? (Counter to Defendants' Argument V) – Actually, PLAINTIFF STATES A VALID CLAIM UNDER THE AMERICANS WITH DISABILITIES ACT.

Defendants argue that Plaintiff's ADA claim should be dismissed because she purportedly did not allege, she is a qualified individual with a disability or how denial of accommodation prevented her access to services . This is incorrect. Plaintiff's Complaint indeed asserts an ADA Title II violation, and while it could have more detail, the necessary elements can be inferred and have been amplified in this Opposition.

To state a Title II ADA claim, a plaintiff must allege that (1) she is a qualified individual with a disability; (2) she was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against; and (3) such exclusion or discrimination was by reason of her disability. Plaintiff meets all three elements.

Qualified individual with a disability: Plaintiff has C-PTSD and severe anxiety, as described above, which substantially limit major life activities including her ability to handle stressful court proceedings and communicate effectively without accommodations. She needs certain supports (e.g., extended time, presence of support person, breaks, perhaps a calmer environment) to participate in legal proceedings on equal footing. PTSD and anxiety disorders are recognized disabilities under the ADA (they substantially limit brain function and major activities like thinking and interacting). Plaintiff is certainly "qualified" to participate in court services – meaning she meets the essential eligibility requirements for being a litigant (she's the party to the case, so by default she's eligible to utilize court processes, with or without accommodations).

Denial of benefits of public services: The state courts and their proceedings are "services, programs, or activities" of a public entity (the state judiciary). Plaintiff requested reasonable accommodations for her disability (for instance, an adjustment in procedure to accommodate her anxiety, perhaps the ability to appear remotely or have a friend assist with notetaking, or a short continuance when overwhelmed). Defendants, particularly Clerk Grant (speaking for the Illinois courts), flatly denied those requests . As a result, Plaintiff struggled to represent herself and effectively communicate her case. She was effectively "excluded from participation" in the court process to the same extent as others without disabilities. For example, when she experienced panic attacks, without accommodation she couldn't speak up to object to false statements, whereas an accommodated person might have had an advocate do so. This denial hindered her ability to be heard, which is denying her the benefits of the court's services (a fair hearing, an accessible proceeding).

By reason of disability: Plaintiff specifically notes that Defendant Grant denied her request for ADA accommodations in the court process . There is no indication it was for any reason other than her disability (indeed, the request was denied because they refused to accommodate that disability; if she had no disability, she wouldn't need accommodation and presumably wouldn't be denied anything). Thus, the causation is clear: *because* she has a disability and requested accommodations, the officials refused, thereby impeding her access. Another way to see it: they did not provide her an equal opportunity to participate, solely due to her condition. That is discrimination under the ADA – at least failure to make reasonable accommodations is a form of discrimination (Title II regulations and case law hold that a public entity must reasonably modify policies to avoid discrimination on the basis of disability, unless it would fundamentally alter the service).

No fundamental alteration or undue burden was shown by Defendants – they simply denied her outright, which is unlawful. If Plaintiff needed, say, a continuance on a bad day or the ability to appear by phone instead of in person due to PTSD triggers, granting that is typically reasonable. Denying it without reason is an ADA violation.

Defendants nitpick that Plaintiff "has not alleged she is a qualified individual with a disability or how without accommodation she was unable to access the court's services" . But that's overly formalistic. She did allege in her narrative that her PTSD impacted the case (implied by stating the need for ADA accommodation and that denial harmed her ability to be heard). Moreover, even if the original complaint was terse, the appropriate remedy would be to

allow an amended complaint to clarify these points. However, given that the user (Plaintiff) clearly intended these to be part of the case, we've detailed them here, and the Court can consider this pro se pleading in a liberal light to find an ADA claim. Indeed, Plaintiff cited Title II and even *Tennessee v. Lane* (which involved court access for disabled individuals, specifically paraplegic who couldn't get to upstairs courtroom; SCOTUS held that states can be sued for that because it implicates fundamental right of access to courts). By citing Lane, Plaintiff signaled that her situation is analogous – she was effectively denied access to the courtroom's justice due to disability .

Given the reasoning of *Lane*, Title II absolutely covers Plaintiff's scenario: it is precisely about ensuring disabled litigants can use the courts. In Lane, it was a physical barrier (no elevator). Here it's a procedural/communication barrier (no allowances for mental health disability). Both are within ADA's scope. Under Lane, states have no immunity for failing to accommodate disability in court access because that implicates due process rights – so aside from stating a claim, we also overcome Eleventh Amendment as earlier noted.

Thus, Plaintiff's ADA claim is well-founded. Defendants' argument to dismiss it should be rejected. Instead, the Court should recognize that Plaintiff has alleged that the Illinois courts failed to make reasonable modifications for her disability, thereby denying her equal access to the legal process, in violation of Title II of the ADA . At minimum, this claim is plausible and should proceed to discovery.

## VI. PLAINTIFF'S STATE-LAW CLAIMS AND OTHER CLAIMS ARE VIABLE.

In addition to her federal claims, Plaintiff has raised issues of state law: specifically, due process and equal protection under the Illinois Constitution, the Illinois constitutional provision on bail, and the Illinois SAFE-T Act. Defendants summarily assert that any state-law claims fail because, they argue, those laws don't apply, or she didn't identify provisions. However, Plaintiff's invocation of these is not frivolous; they provide further support and context for her case.

Firstly, the Illinois Constitution's due process and equal protection clauses (Art. I, §§ 2 and 18) are interpreted generally in step with the federal 14th Amendment. So, if federal claims stand, the state constitutional claims usually stand as well. Illinois courts often consider them coextensively unless a reason to diverge. Here, Plaintiff's allegations certainly state a violation of Illinois's guarantee that no person shall be deprived of life, liberty, property without due process, or denied equal protection. Illinois might even have a more explicit right to remedy (Art. I §12: right to obtain justice freely and promptly). Plaintiff essentially argues she was denied a remedy in state courts, implicating that section as well . That section is not self-executing (it's more a statement of principle), but it underscores that what happened to her (no remedy) is against Illinois public policy.

Secondly, regarding fraud upon the court: Illinois courts recognize that judgments obtained by fraud can be vacated at any time (no statute of limitations for fraud on the court as a concept in Illinois). Plaintiff alleges such fraud (perjury, false evidence, collusion). While "fraud on the court" is not a standalone tort for damages in Illinois, it can be reason to vacate orders.

She might be effectively asking the federal court to declare the state orders void due to fraud. That's tricky (Rooker-Feldman-ish), but if she phrases it as "as a matter of defense the state judgment was void from inception due to fraud," it might circumvent Rooker. Either way, she included it to highlight that normal preclusive effect, or jurisdictional bars shouldn't apply because the underlying state actions were procured by fraud.

As for criminal bail provisions and the SAFE-T Act: Plaintiff noted that Article I, §9 of Illinois Constitution says, "All persons shall be bailable by sufficient sureties except [capital offenses, etc.]." When she was held in contempt (which is quasi-criminal), arguably she should have been entitled to bail or release conditions, not indefinite jailing. The SAFE-T Act (Illinois Public Act 101-652, as amended) eliminated cash bail effective 2023 for criminal defendants. She points out that while criminals benefit from new protections, she as a civil contemnor did not, highlighting inconsistency. Defendants respond that SAFE-T Act is for criminal and not triggered by civil contempt . True, it doesn't by its terms cover civil contempt. However, the spirit is that Illinois wants to avoid jailing people pretrial just because they can't pay bail. In her scenario, she was effectively going to be jailed possibly without a chance to avoid it (or maybe to purge contempt she had to pay something or comply with impossible condition like "turn over child" which she couldn't since father had the child, a catch-22). She is showing the Court that this was unjust even by Illinois's evolving standards. While not a direct legal claim, she included it to illustrate the severity of her treatment relative to current law.

Even if the Court deems references to SAFE-T Act or bail clause to not state an independent claim, mentioning them does no harm and perhaps can be treated as part of her argument for due process or Eighth Amendment. In any case, these references do not undermine her other claims. They certainly do not warrant dismissing the entire complaint (Defendants had lumped them in their catch-all "no state-law claim" argument). At most, the Court could decline supplemental jurisdiction if it dismisses all federal claims (which it should not), or if the state issues predominate (they don't). Right now, the federal claims are core, and the state issues are just supportive or parallel.

To the extent Plaintiff might seek relief under state law (like vacating state orders, which only a state court can formally do), that may not be directly grantable by this Court. But the Court can grant damages for the harm those orders caused, and declaratory relief that her federal rights were violated even if it doesn't outright void the state order (though a declaratory judgment could say "the state order was entered in violation of Plaintiff's rights," which effectively calls it into question). Possibly the resolution would involve coordinating with state courts or abstaining from some remedy, but at pleading stage, none of that is reason to dismiss.

Finally, Plaintiff's complaint speaks of "fraudulent judicial practices" and "obstruction of justice". If those were to be construed as some common-law tort, Illinois does have torts like abuse of process or intentional infliction of emotional distress (IIED). She didn't label them explicitly, but the facts might support an abuse of process claim: using legal process (DV Act, contempt) for an ulterior motive. Illinois recognizes that tort (though it requires some misuse beyond just filing a suit – arguably here process was misused to do something it wasn't intended for, e.g., DV Act intended to protect from abuse, not to change custody permanently). That indeed is an ulterior motive misuse. She may not have formally pleaded it, but the allegations

meet it. Similarly, the extreme distress caused could form an IIED claim under Illinois law: Defendants' conduct was extreme and outrageous, intended to cause or with reckless disregard of causing emotional distress, and it did cause severe distress. Actually, yes, taking a child wrongly from a mother is textbook extreme and outrageous beyond bounds of decency. So she could have an IIED claim against, say, the father and his attorney and any others who acted outrageously (conceivably even the GAL if malicious). The statute of limitations for IIED in Illinois is two years (if not based on defamation, which this is not), so if accrual is from 2020 it might be late, but if continuing harm or tolling, possibly still viable. Regardless, she didn't explicitly assert IIED, but as a pro se, courts might read into "fraud upon the court" as a lay way of saying "they committed an intentional tort by defrauding the court, which harmed me." That can be analogous to IIED or abuse of process.

We mention this not to complicate, but to show that her complaint can be construed to allege some state torts too, which on a motion to dismiss one wouldn't toss lightly if facts support them (immunity could be an issue though, e.g., GAL might have immunity from IIED, but father and his lawyer wouldn't for off-court collusion maybe).

In conclusion, Plaintiff's state-law contentions are not insufficient; they are logically tied to her narrative and bolster her case. At this stage, none of them warrant dismissal. If anything, they show that the violations of her rights were also violations of Illinois law and policy, reinforcing that Defendants' actions were wholly illegitimate.

CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motions to dismiss in their entirety. Plaintiff has established that this Court has jurisdiction and that her Complaint, liberally construed, states multiple viable causes of action under federal and state law. The egregious conduct alleged – including deprivation of parental rights without due process, disability discrimination, and fraud on the court – merits a full examination on the merits, not a dismissal on pleadings.

Plaintiff therefore prays that this Honorable Court:

1. Deny the motions to dismiss filed by Defendants in this case;

2. Allow all of Plaintiff's claims (constitutional, ADA, and related state-law claims) to proceed to discovery and adjudication;

3. Grant such other and further relief as the Court deems just and appropriate, including scheduling a status conference to discuss case management moving forward.

By shining a light on the constitutional violations and injustices Plaintiff endured, this Court can ensure that the promises of due process, equal protection, and equal access to justice are upheld. Plaintiff looks forward to proving her claims and finally obtaining the relief to which she

is entitled – including vindication of her rights, compensation for her losses, and restoration of her family integrity to the fullest extent possible.


Dated: March 14, 2025

Respectfully submitted,


/s/ Kimberly S. Lopez

Kimberly S. Lopez

16036 84th Place

Tinley Park, Illinois 60487

(708) 983-3934

kslopez777@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 10, 2025, a true and correct copy of the foregoing Plaintiff's Opposition was filed with the Clerk of the Court and served on all Defendants or their counsel of record via the Court's CM/ECF system and/or by email as appropriate.

*/s/ Kimberly S. Lopez*

Kimberly S. Lopez

16036 84th Place

Tinley Park, Illinois 60487

(708) 983-3934

kslopez777@gmail.com
